Argued and submitted January 3, affirmed May 9, 2001

Denisa JENNISON
and Robert Jennison,
*Respondents,*

*v.*

PROVIDENCE ST. VINCENT
MEDICAL CENTER,
*Appellant,*

*and*

Dale NUNEZ, M.D.;
Bruce Yawitz, M.D.; David Cook, M.D.;
Matthew Slater, M.D.; Jeffrey Adams, M.D.;
Frederick Ing, M.D.; and David Nunez,
*Defendants.*

9701-00543; A106202

25 P3d 358

James N. Westwood argued the cause for appellant. With him on the briefs were David Van't Hof and Stoel Rives LLP.

Mark R. Bocci and Ralph J. Brindley argued the cause for respondents. With them on the brief were Pippin & Bocci, Paul N. Luvera, Luvera Barnett Brindley Beninger & Cunningham, W. Eugene Hallman and Hallman & Dretke.

Before Wollheim, Presiding Judge, and Kistler, Judge, and Lipscomb, Judge pro tempore.

WOLLHEIM, P. J.

## WOLLHEIM, P. J.

In this medical malpractice action, defendant Providence St. Vincent Medical Center (hospital) appeals from the trial court's judgment after the jury had found in favor of plaintiffs.[1] Hospital makes several assignments of error, which we will address in turn. We affirm.

We review the facts in the light most favorable to plaintiffs, and "plaintiff[s are] entitled to the benefit on this appeal of all evidence favorable to [them] and of all inferences which may be reasonably drawn from such evidence." *Hansen v. Bussman*, 274 Or 757, 759, 549 P2d 1265 (1976).

Most of the relevant facts are not in dispute. On May 11, 1996, Jennison, a 45-year-old woman with a history of abdominal pain, was found by Robert lying on the floor of their home in severe pain. Jennison was taken to the emergency room of hospital, where she was admitted for diagnosis. Jennison was placed under the care of Dr. Cook, who ran numerous diagnostic tests on her in an attempt to make a diagnosis and to decide whether surgery was necessary.

Jennison remained in the hospital for the next several days while Cook and other physicians attempted to ascertain the cause of her abdominal problems. On May 16, 1996, Cook, still unsure of the cause of Jennison's medical problems, spoke with Jennison and Robert about an option to proceed with an exploratory laparoscopy. Cook recommended that surgery because he had noticed an abnormality in Jennison's small intestine and believed that it might have been the cause of her problems. Jennison agreed to the laparoscopy surgery and signed a consent form.[2] The surgery was performed on May 17, 1996.

---

[1] Plaintiffs include both Denisa Jennison and her husband Robert Jennison. Throughout the remainder of this opinion we will refer to Denisa Jennison as "Jennison" and to her husband as "Robert."

[2] The consent form contained the following language, in part:

"To the extent it is considered advisable for my care, I consent to anesthesia, blood transfusions, pathology laboratory services, radiology services, prescription drugs or other medication as authorized by my physician."

Before surgery on the morning of May 17, Cook asked Dr. Nunez, a member of an independent anesthesiologists' group at hospital, to place a central venous catheter (central line)[3] in Jennison. Later that morning, Jennison was taken to the operating room (OR) where she was given a general anesthetic by Nunez at approximately 10:50 a.m. Once Jennison was asleep, Nunez inserted the central line. The surgery commenced at approximately 11:20 a.m. During the surgery, Cook discovered the source of Jennison's abdominal pain—there was significant infection and abscesses in her right fallopian tube and ovary.[4] Cook then called Dr. Stewart, a gynecologist, to get his opinion. Stewart removed the infected organs. Cook then left the OR, allowing Stewart to complete the operation. The surgery ended at approximately 1:00 p.m.

At 1:10 p.m., Jennison was taken to the Post Anesthesia Care Unit (PACU) with the central line still in place.[5] Dr. Slater, a surgical resident who had assisted Cook during the surgery, wrote out post-operative orders. Those orders included a portable chest x-ray to be taken in the PACU. The purpose of the chest x-ray was to check the placement of the central line. The x-ray was completed by approximately 1:45 p.m.

While in the PACU, Jennison continued to have severe pain. Nunez had left Jennison in the PACU with a nurse. When Nunez returned at 3:30 p.m., he noticed that Jennison was still there. The nurse told him that Jennison continued to have pain control problems. At approximately 4:00 p.m., Slater received a telephone call from the PACU nurse informing him that Jennison was still in a great deal of

---

[3] As used in this case, a central line is a flexible plastic catheter tube inserted through the base of the patient's neck into the jugular vein. The central line is then fed through the internal jugular vein down into the superior vena cava. When it reaches the superior vena cava, the tube extruding from the patient's body at the neck is then sutured into place to prevent it from moving. Once properly in place, the central line is used to infuse liquids into the patient.

[4] Cook initially started the surgery with a laparoscopy but, after noticing a severe abscess, he decided to make an incision to examine more closely the infected organs.

[5] Patients who are anesthetized during surgery are transported from the OR to the PACU for monitoring.

pain. Slater ordered more pain medication to be administered. Around that same time, while Cook was making his rounds, he ran into Robert. Robert asked Cook why his wife was still in the PACU. Unsure, Cook called the PACU and was told about Jennison's pain management problems. Cook ordered the placement of an epidural line. Because Nunez was unavailable, Dr. Ing, an on-call anesthesiologist, placed the epidural line. Ing began the epidural process at approximately 5:05 p.m. However, after a test dose was administered, Jennison's eyes rolled into the back of her head, her blood pressure fell dangerously low, her heart rate rose, she became "clammy," and broke into a cold sweat. Ing, not knowing what was happening to Jennison, discontinued the epidural.

At approximately 5:30 p.m., Slater was called back to the PACU to respond to Jennison's sudden change in condition. At that point Slater noticed that the central line placed during surgery earlier that day was not in use. He was unsure of whether the x-ray, taken over four hours earlier, had been checked to confirm the correct placement of the central line. It was at that point that Slater decided to check the x-ray himself and discovered that the central line had been inserted a few centimeters too far down. The tip had gone beyond the superior vena cava, through the right atrium, and into the pericardial sac of Jennison's heart. Slater went back to the PACU at approximately 5:45 p.m., and the central line was pulled back a few centimeters to its proper position. A few more hours passed, but Jennison was still not responding to treatment. The doctors were still unsure of what was happening to her.

At approximately 7:00 p.m., Jennison started complaining of severe chest pain. At 7:40 p.m., she was taken from the PACU to the intensive care unit (ICU). At approximately 8:50 p.m., Jennison went into cardiac arrest, which lasted approximately 30 to 40 minutes. The doctors successfully resuscitated her. It was then that the doctors concluded that Jennison was experiencing a cardiac tamponade.[6] At

---

[6] A cardiac tamponade is the "compression of the heart due to critically increased volume of fluid in the pericardium." *Stedman's Medical Dictionary*, 1761 (26th ed 1995).

some point after the central line was inserted too far down and before it was repositioned back into its proper place, fluids were infused through the central line and into the space between her heart and her pericardial sac. The pressure of the fluid against her heart kept it from filling adequately, essentially crushing it. That in turn caused her blood pressure to drop and eventually ending in cardiac arrest. The doctors attempted to remove the excess fluid from the area of her heart. During the procedure, Jennison suffered a second cardiac arrest, lasting approximately 40 minutes. The doctors were again able to resuscitate her. However, due to the lack of oxygen to her brain, Jennison suffered a severe brain injury.

A jury returned a multi-million dollar verdict in favor of plaintiffs, finding hospital 100 percent negligent.[7] Hospital subsequently moved for a new trial or modification of the judgment. The trial court denied that motion and hospital filed this appeal.

■■ Hospital first assigns error to the trial court's denial of its motion to strike one of six separate specifications of negligence against it. Hospital claims that there was no evidence to support the specification, and it was error to allow the jury to consider it. We will reverse only if there was "no evidence from which the jury could have found the necessary facts." *Leggett v. First Interstate Bank of Oregon*, 86 Or App 523, 528, 739 P2d 1083 (1987).

The specification of negligence at issue is that "[hospital was negligent] in failing to have policies and procedures controlling the verification of placement and use of central venous lines in the PACU." Hospital argues that because there was evidence of a hospital policy, that specification of negligence was not supported by evidence. Therefore, hospital asserts, because the jury returned a general verdict in favor of plaintiffs and the court cannot tell whether the unsupported allegation is one in which the jury rested its finding of liability, the rule set out in *Whinston v. Kaiser*

---

[7] The three defendants at trial included Cook, Nunez, and hospital. The jury's verdict found both Cook and Nunez zero percent negligent. Other initially named defendants were voluntarily dismissed by plaintiffs.

*Foundation Hospital*, 309 Or 350, 788 P2d 428 (1990), requires us to remand the case for a new trial.[8] Plaintiffs argue that *Whinston* is inapplicable here, because there is evidence to support the allegation of negligence submitted to the jury. We agree with plaintiffs.

Determining whether hospital had a policy regarding the verification of placement of central lines in the PACU depends on the definition of policy. *Webster's Third New Int'l Dictionary*, 1754 (unabridged ed 1993), defines "policy"[9] as:

> "**5 a** : *a definite course or method of action selected* (as by a government, institution, group, or individual) *from among alternatives and in the light of given conditions to guide and usu[ally to] determine present and future decisions* **b** (1) : a specific decision or set of decisions designed to carry out such a chosen course of action (2) : such a specific decision or set of decisions together with the related actions designed to implement them **c** : a projected program consisting of desired objectives and the means to achieve them ‹formulation of ‑ ›[.]" (Emphasis added.)

The record indicates that there was a written *nursing* policy pertaining to "non-urgent placement [of central venous lines] outside [the] surgical area." That written policy provides:

> "1.    Only credentialed physicians are responsible for insertion of any central line with the exception of PICCs.

---

[8] *Whinston* holds that

"where (1) more than one allegation of negligence is submitted to the jury; (2) one or more of, but not all, the allegations are unsupported by the evidence; and (3) it cannot be determined upon which allegation the jury based its verdict, this court has held that a new trial must be granted." 309 Or at 357.

[9] We note that the specification of negligence at issue here refers to both policies and procedures. *Webster's Third New Int'l Dictionary*, 1807 (unabridged ed 1993), defines "procedure" as:

"**1 a** : a particular way of doing or of going about the accomplishment of something * * * **b** (1) : a particular course of action * * * (2) : a particular step adopted for doing or accomplishing something * * * (3) : a series of steps followed in a regular orderly definite way * * * **c** (1) : a traditional, customary, or otherwise established or accepted way of doing things[.]"

Because the definitions of policy and procedure are substantially similar, the ensuing analysis applies to whether hospital had "*policies and procedures* controlling the verification and placement and use of central venous lines in the PACU." (Emphasis added.)

"2.   Placement should be verified by chest x-ray as soon as clinically [feasible]."

However, the record also includes evidence that hospital had no policy, oral or written, regarding the procedure after the x-ray was taken, that is, controlling the verification. Hospital did not have a "definite course or method of action * * * to guide and usu[ally to] determine present and future decisions" pertaining to review of the x-ray. Cathy Leedy, a clinical imaging manager responsible for mammography and radiology, testified:

"Q   And is there any written policy or procedure that says the radiologists are supposed to review and read the x-rays as they are developed; and if it's a line placement, then call the floor and confirm that the placement is okay?

"A   No."

Furthermore, Charis Yoder, a nurse manager in the PACU, testified regarding whether there was a specific oral policy or understanding that is followed when a central venous line is placed:

"Q   In talking about St. Vincent * * * you've told us— and I believe there is no testimony otherwise—is that the tech, after the X-ray is taken, is to take that X-ray to the radiology department for a wet read; is that right —

"A   Correct.

"Q   — under these circumstances. And radiology, under that system, is supposed to make a phone call once they have done the wet read; is that right?

"A   Correct.

"Q   * * * that call may go to the patient's nurse; is that right?

"A   Correct.

"Q   May go to the patient's surgeon, the name that appears on the order for the X-ray.

"A   Correct.

"Q   May go to the resident if there's a resident assisting the surgeon.

"A   Yes.

"Q   May go to the anesthesiologist if the radiologist knows who that is.

"A   Correct.

"Q   May even go to the floor * * * meaning, I assume, the PACU, and someone, perhaps, other than that patient's nurse. Have we gathered that sometimes happens?

"A   I heard that they call the unit and talk to the nurse.

"* * * * *

"Q   Isn't it true that at least four and possibly five different places to call have been identified in the testimony that we've had in this case?

"A   Yes.

"Q   Radiology just has a number of options in terms of who to call; is that right?

"A   Yes.

"* * * * *

"Q   * * * isn't it true * * * that the system in place in May of 1996 does not designate one person, one position, that will always get the call with regard to the confirmation of the line placement?

"A   Yes."

We agree with plaintiffs that the evidence supports the conclusion that hospital had no policy or procedure regarding the followup on central lines placed in the OR when a patient is transferred to the PACU. The call from radiology could potentially go to one of five different people, depending on whom the radiologist decides to call. Furthermore, no written documentation was required once one of those people received the call from radiology, thus precluding other people from knowing whether the call was ever actually made. Hospital's policy and procedure required verification, but it did not control what happened thereafter. Therefore, hospital's first assignment of error must fail.

■      In hospital's second assignment of error, it contends that the trial court erred in allowing the jury to consider the following two mutually exclusive specifications of negligence:

> "[COURT]:   * * * Plaintiff alleges Defendant St. Vincent Hospital was negligent in one or more of the following particulars:
>
> "* * * * *
>
> "C, in failing to follow a hospital policy for the taking and reading of X-rays which would confirm the location of a central line catheter shortly after placement in violation of the hospital's own standards;
>
> "* * * * *
>
> "Item E, in failing to have policies and procedures controlling the verification of placement and use of central venous lines in the PACU."

We disagree with hospital's assertion. "A party need only choose between or among inconsistent *remedies*, not inconsistent claims or theories of recovery. ORCP 16C specifically allows inconsistent claims to be pleaded and tried." *Arter v. Spathas*, 98 Or App 362, 367, 779 P2d 1066 (1989) (emphasis in original).

■■      Hospital next argues that the trial court erroneously instructed the jury that it could find hospital liable for Jennison's injuries under an apparent agency theory if Jennison "reasonably believed" the nonemployee radiologists were employed by hospital.[10] We review jury instructions as a whole and "will reverse only if we 'can fairly say that the instruction probably created an erroneous impression of the law in the minds of the jury[ ] which affected the outcome of the case.'" *Bray v. American Property Management Corp.*, 164 Or App 134, 142, 988 P2d 933 (1999), *rev den* 330 Or 331 (2000) (quoting *Waterway Terminals v. P. S. Lord*, 256 Or 361, 370, 474 P2d 309 (1970)).

■■      The trial court instructed the jury on the issue of apparent agency as follows:

---

[10] Apparent agency is also known as ostensible agency. *See Shepard v. Sisters of Providence*, 89 Or App 579, 585-86, 750 P2d 500 (1988). For ease of reference, we will refer to it as "apparent agency" throughout the remainder of this opinion.

"If you find that the defendant hospital had undertaken to provide radiology physicians to the community and that the plaintiffs reasonably believed that the radiologists were employed by the defendant hospital to deliver radiology services, then, in such event, the hospital would be liable for any negligence of the radiologists, if you so find."

Apparent agency is rooted in agency law and, in the hospital context,

"stand[s] for the proposition that physicians who are nominally 'independent contractors' may be treated as actual or ostensible hospital agents, for purposes of vicarious liability, when they perform professional services which are integral to hospital operations and which hospitals hold themselves out to the public to provide." *Shepard*, 89 Or App at 587.

Apparent agency is an exception to the generally accepted rule that the torts of independent contractors will not be imputed to their "employer."

"The root of the doctrine is that the principal has the knowledge of the apparent agent's true status which makes it possible for the principal, by inadvertence or design, to create or prevent a third party's reasonable misimpression that the agent has authority to act for the principal." *Id.* at 589.

One formulation of this doctrine is set forth in *Restatement (Second) of Agency* § 267 (1958), entitled "Reliance upon Care or Skill of Apparent Servant or Other Agent." Section 267 of *Agency* provides:

"One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such."

Another formulation of the doctrine of apparent agency is set forth in *Restatement (Second) of Torts* § 429 (1965), entitled "Negligence in Doing Work Which is Accepted in Reliance on the Employer's Doing the Work Himself." Section 429 of *Torts* provides:

"One who employs an independent contractor to perform services for another which are accepted in the reasonable

belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants."

In the hospital context, both section 267 of *Agency* and section 429 of *Torts* have been applied to hold a hospital vicariously liable for the acts of its "independent contractors." Furthermore, both section 267 of *Agency* and section 429 of *Torts* require some form of reliance on behalf of the third party. Courts from other jurisdictions have indicated that under section 267 of *Agency* "there must be actual reliance upon the representations of the principal by the person injured." *Jackson v. Power*, 743 P2d 1376, 1380 (Alaska 1987); *see also Houghland v. Grant*, 119 NM 422, 891 P2d 563, 568 (1995) ("Agency by estoppel appears to have a stricter standard because it requires actual reliance upon the representations of the principal."). On the other hand, section 429 of *Torts* simply focuses on the "patient's belief that the hospital or its employees were rendering health care." *Sword v. NKC Hospitals, Inc.*, 714 NE2d 142, 152 (Ind 1999); *see also Simmons v. Tuomey Regional Medical Center*, 341 SC 32, 533 SE2d 312, 322 (2000) (section 429 is applicable "when the injured person accepts services in the belief they are being rendered by the independent contractor's employer.").

Hospital argues that the Oregon courts have utilized section 267 of *Agency* to impose liability on hospitals, not section 429 of *Torts*. Thus, hospital asserts that the proper standard for determining whether it can be held vicariously liable for the acts of the independent contractor radiologists is not whether Jennison "reasonably believed" they were employees of hospital. Rather, it argues that under section 267 of *Agency*, Jennison had to "justifiably rely" on hospital's holding the radiologists out as its employees. Therefore, because the trial court instructed the jury on a standard that more closely resembles that from section 429 of *Torts*, which, hospital argues, Oregon courts have not embraced, it was an error of law requiring reversal of the jury verdict. We disagree.

In the hospital context, Oregon case law has never completely embraced and applied the justifiable reliance

standard of section 267 of *Agency*, nor has it ever adopted or rejected the standard of section 429 of *Torts*. Rather, a close review of the sparse case law on this subject suggests that Oregon applies a combination of the two sections. This can best be explained by examining the pertinent case law.

■     The first instance in which we applied the apparent agency doctrine in the hospital context was in *Themins v. Emanuel Lutheran*, 54 Or App 901, 637 P2d 155 (1981), *rev den* 292 Or 568 (1982). There, we said that "[t]he rule of apparent agency is set forth in *Restatement (Second) of Agency* § 267 P 578 (1958)," and we set out the language of that section and its *comment a. Themins*, 54 Or at 908. We further explained that,

> "[a]lthough it cannot reasonably be said that Emanuel literally *invited* plaintiff to utilize the services of the house officers for which it had contracted, it had nevertheless undertaken to provide emergency treatment to the community. An express invitation was not required.
>
> "There is nothing in the record to show that plaintiff should have been on notice that [the emergency room physician] was *not* an employee of Emanuel. Certainly, it would be unreasonable to require that an emergency room patient ask whether the doctors attending him in the emergency room are employees of the hospital." *Id.* at 908-09 (emphasis in original).

That language relates to the first element or standard set forth in section 267 of *Agency* that the principal represents or "holds out" another as its agent. *Themins* explains that, under that element of the doctrine, the hospital need not expressly represent to a patient that the physician caring for him or her is a hospital employee. In *Shepard*, we stated that *Themins* and similar cases from other jurisdictions also stand for the proposition that there are certain services performed by a hospital that will be deemed "integral to hospital operations and which hospitals hold themselves out to the public to provide." *Shepard*, 89 Or App at 587; *see also Jones v. Salem Hospital*, 93 Or App 252, 267, 762 P2d 303 (1988), *rev den* 307 Or 514 (1989).[11] Thus, under the first element, if

---

[11] Some examples of those integral services include radiology, pathology, and emergency care. *Jones*, 93 Or App at 267; *see also Gilbert v. Sycamore Municipal*

the hospital undertakes to provide certain services to the public and there is no evidence indicating that the patient was aware of the physician's nonemployee status, then the "holding out" requirement of the doctrine is satisfied.

The next opportunity we had to address the apparent agency doctrine was in *Shepard*. There, the plaintiff was injured during surgery by a surgical resident who was assisting the primary surgeon during surgery. Because the patient was under general anesthesia, she was unaware of the surgical resident's presence during her surgery, nor was she informed that the resident would be assisting during the surgery. When addressing whether the hospital could be liable under an apparent agency theory, the hospital attempted to distinguish *Themins* by arguing it could not be "charged with *respondeat superior* liability on the basis of [apparent] agency when the injured patient has contracted with a private physician, who is in charge of the patient's care at hospital and whose own negligence cannot be imputed to it." *Shepard*, 89 Or App at 588. We disagreed with the hospital's argument and stated:

> "The relevant relationship in this case is between hospital and [the surgical resident], not between it and any private physician with whom plaintiff contracted. The fact that plaintiff contracted with a private physician as her primary surgeon is not, as a matter of law, inconsistent with hospital's having clothed [the surgical resident] with [apparent] authority to act as its agent in assisting the private doctor and in rendering professional care to plaintiff." *Id.*

The hospital further argued that *Themins* was distinguishable because in that case the patient had actual contact with the emergency room physicians, and the patient could not

*Hospital*, 156 Ill 2d 511, 622 NE2d 788, 796 (1993) ("[T]he element is satisfied if the hospital holds itself out as a provider of emergency room care without informing the patient that the care is provided by independent contractors."); *Hardy v. Brantley*, 471 So2d 358, 371 (Miss 1985) ("[P]atients often seek emergency room care and treatment from the hospital, not from any particular physician. * * * Although there may be important factual variations from case to case, a patient's non-selection of his physician is often the rule in the case of anesthesiologists, radiologists and particularly emergency room physicians."); *Guadagnoli v. Seaview Radiology, P.C.*, 184 Misc 2d 961, 712 NYS2d 812, 817 (2000) ("Defendant Seaview Radiology held itself out to the public offering and rendering radiological services and therefore Seaview should be estopped from claiming no responsibility on the part of their independent contractor.").

have obtained emergency services except through the physicians who were on duty at that time. In *Shepard*, by comparison, as the hospital argued, the patient had no pre-surgical contact with the surgical resident nor did the hospital give the patient any information regarding the resident's existence and what role he was to play in her surgery. In response we stated:

> "The thrust of hospital's argument is that a hospital cannot be found to have made a representation of [apparent] authority, and a patient cannot be found to have relied on such a representation, unless the putative [apparent] agent has pre-therapeutic contact with or is made known to the patient before the treatment. We do not agree that the [apparent] agency doctrine is that narrow. Indeed, reading it that narrow would undermine its purpose. * * *

> "* * * If the holding out occurred before the injurious event and if the third party's reliance on the representation pertained to the prospective event, the doctrine is applicable.

> "Applying what we have said to this case, there was evidence from which the jury could find that [the surgical resident] was hospital's [apparent] agent. Although a private physician was in charge of the surgery, it could be found that hospital represented that the support personnel assisting the surgeon in its operating room would be hospital employes; and although plaintiff did not know about [the surgical resident] himself, it could be found that *hospital represented, and she justifiably believed* that any *employe* who performed the services that [the surgical resident] did on hospital facilities would be hospital's employe rather than a different unknown third party's." *Shepard*, 89 Or App at 588-89 (first emphasis added; second emphasis in original).

In *Shepard*, we addressed the second element of the apparent agency doctrine. That element is one of reliance, which cuts across both section 267 of *Agency* and section 429 of *Torts*. The language in *Shepard* used to define the reliance element more closely resembles that of section 429 of *Torts*. Specifically, the hospital represented and the patient "justifiably believed" that the services performed by the surgical resident were those of a hospital employee and not of an employee of an unknown third party. *Id.* at 589.

We find *Shepard* factually similar and instructive on the issue before us. In *Shepard,* the patient was totally unaware of the surgical resident's presence during her surgery. Thus, because the patient was completely oblivious to the existence of the surgical resident before and during her surgery, it follows that it was impossible for her actually to have relied on the hospital's "holding out" or representation. Although aware of the justifiable reliance language of section 267 of *Agency*, we applied a less strict standard and held that it was possible for patient to have justifiably believed that the services performed on her were done by an employee of the hospital and not an employee of a third party.

Similarly here, Jennison was totally unaware of the radiologist charged with reading her x-ray. The extent of her knowledge of radiology services at hospital was that from the consent form she signed prior to surgery. Nowhere did the consent form indicate that the radiologists were independent contractors. Thus, it is reasonable to assume that when a patient in Jennison's situation signs a consent form like the one she signed and later has an x-ray taken, the patient would believe that it would be a hospital employee who would ultimately interpret that x-ray.

We recognize that in *Miller v. McDonald's Corp.*, 150 Or App 274, 945 P2d 1107 (1997), a franchiser/franchisee case, we applied section 267 of *Agency*.[12] We also recognize that we applied an actual reliance standard to determine whether the franchiser, McDonald's Corp., could be held vicariously liable for the actions of a franchisee. *Id.* at 282. When analyzing whether the customer of the franchisee actually relied on the franchiser's holding the franchisee out as its apparent agent, we held that the customer's reliance had to be objectively reasonable. *Id.* at 287 ("[P]laintiff testified that she relied on the general reputation of McDonald's in patronizing the Tigard restaurant and in her expectation of the quality of the food and service that she would receive.

---

[12] We note that in *Miller*, we stated that we "adopted" section 267 of *Agency*. However, that does not mean that we "enact[ed] the exact phrasing of the *Restatement* rule, complete with comments, illustrations and caveats." *See Brewer v. Erwin*, 287 Or 435, 455 n 12, 600 P2d 398 (1979). The application of section 267 of *Agency* in *Miller* is not inconsistent with the application of section 429 of *Torts* in the appropriate case.

* * * [A] jury could find that plaintiff's reliance was objectively reasonable.").

However, in the hospital context, we prefer the standard set forth in *Shepard*. That standard is more appropriate because, in some cases, the patient might be so severely impaired as to be incapable of communicating or may not survive the negligent acts of an independent contracting physician. In those cases it would be nearly impossible to prove that the patient actually relied on the hospital's holding the physician out as an employee of the hospital. It would be incongruous to allow a patient who survives a negligent encounter relatively intact to recover because she or he is able to testify whether she or he actually relied, but not allow a severely impaired or deceased patient to recover because she or he is unable to recount what her or his actual belief was.

■ The applicable rule of law that we glean from the Oregon case law concerning apparent agency in the hospital context is (1) the hospital must hold itself out as a provider of medical services, and (2) unless the patient has actual knowledge of the physician's actual status as an independent contractor, the patient can recover if it is objectively reasonable for the patient to believe that physician is an employee of the hospital.

■ By applying that standard to this case, we hold that the trial court did not err in instructing the jury in the fashion it did. Hospital held itself out as providing radiology services to the public. Not only is hospital required by Oregon law to provide those services, *see* OAR 333-520-0040(1)(a), (d), but also several witnesses testified that radiology services are integral to the overall medical services provided by hospital, thus satisfying the first element. In regard to the second element, there is no evidence that suggests that Jennison had actual knowledge of the radiologist's nonemployee status. Furthermore, it is reasonable to assume that a person in Jennison's position would not have known that a radiologist, a physician Jennison *never* met nor had any knowledge of, would be anything other than an employee of hospital.

"The public, in looking to the hospital to provide such care, is unaware of and unconcerned with the technical complexities and nuances surrounding the contractual and employment arrangements between the hospital and the various medical personnel operating therein. * * * Public policy dictates that the public has every right to assume and expect that the hospital is the medical provider it purports to be." *Clark v. Southview Hospital & Family Health Center*, 68 Ohio St 3d 435, 628 NE2d 46, 53 (1994).

Therefore, we hold that the trial court's instructions to the jury were not in error.

■    Hospital's fourth and fifth assignments of error are closely related to its third assignment of error. Hospital contends that the trial court erred in admitting testimony of Robert's personal belief that the radiologists were employees of hospital and in instructing the jury to assess the reasonable belief of the "plaintiffs" instead of Jennison alone. As explained previously, the "reasonable belief" element need not be limited to the actual subjective belief of the injured patient. Rather, if an objectively reasonable person would believe that the physician was an employee of hospital, the element is satisfied.[13] That view is further supported by the South Carolina Supreme Court's recent analysis of the reasonable belief element:

"Section 429 applies not only when the injured person accepts services in the belief they are being rendered by the independent contractor's employer, but also when a third person accepts such services on the injured person's behalf and reasonably believes the services are being rendered to the injured person by the independent contractor's employer. * * * Under section 429, the plaintiff must show that * * * *a person in similar circumstances reasonably would have believed that the physician who treated him or her was a hospital employee.*" *Simmons*, 533 SE2d at 322 (emphasis added; citation omitted).

---

[13] We note that if the patient has actual knowledge of the independent contractor's true status, then the element cannot be satisfied because an objectively reasonable person in the patient's position could not reasonably believe that physician was an employee of the hospital.

The trial court did not err in allowing a jury to consider Robert's belief or instructing the jury to consider the reasonable belief of the plaintiffs.

Affirmed.