[No. E028795. Fourth Dist., Div. Two. July 12, 2002.]

MARIA DEL CARMEN MEJIA, Plaintiff and Appellant, v. COMMUNITY HOSPITAL OF SAN BERNARDINO, Defendant and Respondent.

## COUNSEL

Martin P. Weniz for Plaintiff and Appellant.

Thompson & Colegate, Don G. Grant and Laura D. Schmidt for Defendant and Respondent.

## OPINION

**McKINSTER, Acting P. J.**—Maria Del Carmen Mejia (plaintiff) appeals from a judgment of nonsuit in favor of Community Hospital of San Bernardino (respondent or respondent hospital), one of several defendants in her medical malpractice complaint. Plaintiff argues that there was sufficient evidence that the negligent physician was the ostensible agent of respondent to survive the motion for a nonsuit. We agree and reverse, concluding that a nonsuit on the issue of ostensible agency was improper because plaintiff sought treatment at respondent hospital and there was no evidence that she should have known that the negligent physician was not an agent of respondent.

### STATEMENT OF FACTS

In April 1997, plaintiff heard something pop in her neck when she bent over to move some boxes. Her neck immediately became stiff, and she suffered neck pain and stiffness off and on for a couple of weeks. Nevertheless, plaintiff went about her business, using acetaminophen to control the pain, until May 3, 1997, when she awoke with severe neck pain and her head was twisted to one side. That night, plaintiff's mother convinced plaintiff to go to the emergency room (hereinafter sometimes ER).

A neighbor took plaintiff, her mother, and her cousin to the ER at respondent hospital and dropped them off. Around 3:00 a.m., plaintiff was examined by an ER physician. The ER physician prescribed hydrocodone and acetaminophen for the pain and a tranquilizer to relax the muscles, and ordered X-rays of plaintiff's neck. The ER physician sent at least one X-ray to the on-call radiologist for an evaluation. The radiologist reported that he saw a congenital fusion, but nothing else. Based in part on the radiologist's report, the ER physician discharged plaintiff, telling her that she had a twisted neck, but was otherwise all right.

When a nurse came in to escort plaintiff and her family out, plaintiff began to feel nauseous from the medication and vomited several times. The last time she vomited, her family had to lift her head out of the toilet and put her in a wheelchair. When they left respondent hospital, plaintiff tried to get into her sister's car, but was unable, so her family lifted her into the car. After taking plaintiff home, her family put her in bed. Plaintiff slept all day and all night. When she awoke the next morning, she could feel the pain in her neck again, but could not move her arms or legs and felt numb throughout her body. Plaintiff was taken by an ambulance to another hospital, where it was determined that her neck was actually broken and she was paralyzed.[1]

Plaintiff filed a medical malpractice suit against respondent, the ER physician, the radiologist, Emergency Physicians Medical Group (the company that contracted to run the ER for respondent and employed the ER physician), and MSB Radiology Medical Group (the company that contracted to run the radiology department for respondent and employed the radiologist). The case proceeded to trial, where respondent successfully moved for a nonsuit immediately after the close of plaintiff's case. Regarding the remaining defendants, the jury found that the radiologist and his employer, MSB Radiology, were negligent, but the ER physician and his employer, Emergency Physicians Medical Group, were not.

### DISCUSSION

On appeal, plaintiff argues that respondent was not entitled to a nonsuit because there was a triable issue as to whether the negligent radiologist was the ostensible agent of respondent. We agree.

a. *National Trend*

For the last century, courts throughout the country have struggled with the issue of whether hospitals are liable for the negligence of physicians. In

---

[1] Plaintiff has made some progress with the paralysis. As of trial, she had regained some strength in her upper body and was able to move her arms.

doing so, they have confronted and cast aside two major impediments to liability.

The first impediment overcome was that of charitable immunity. Early cases endowed hospitals with charitable immunity based on the theory that their funds should not be diverted from charitable purposes to pay tort damages. (*Silva v. Providence Hospital of Oakland* (1939) 14 Cal.2d 762, 771 [97 P.2d 798] (*Silva*); *Simmons v. Tuomey Regional Medical Center* (2000) 341 S.C. 32 [533 S.E.2d 312, 316] (*Simmons*); *Clark v. Southview Hosp. & Family Health Ctr.* (1994) 68 Ohio St.3d 435 [628 N.E.2d 46, 50-51, 58 A.L.R.5th 929] (*Clark*).) At that time, hospitals were true charities, providing minimal services to only the lowest classes of society. They were usually underfunded, dirty, crowded, and staffed by unpaid volunteer physicians who donated a few hours a week out of a sense of charity and for the unique opportunity to literally "practice" their skills on the poor. (*Simmons*, at p. 316; *Clark*, at p. 51.) In substance, hospitals actually were nothing more than "hotels providing rooms, buildings where private medical practitioners treat private patients . . . ." (*Paintsville Hosp. Co. v. Rose* (Ky. 1985) 683 S.W.2d 255, 258 (*Paintsville*).)

Fortunately for all concerned, however, hospitals evolved. "Today, hospitals compete aggressively in providing the latest medical technology and the best facilities, as well as in attracting patients and physicians who will funnel patients to them. Hospitals not only strive to be a source of pride in the local community, but they also seek to avoid operating at a financial loss. Regardless of whether they are profit-seeking enterprises, they are run much like any large corporation and must operate in a fiscally responsible manner. Like any business dependent upon attracting individual people as customers, hospitals in the aggregate spend billions to advertise their facilities and services in a variety of media, from newspapers and billboards to television and the Internet." (*Simmons, supra,* 533 S.E.2d at pp. 316-317.) As a result of this evolution, courts withdrew the protections of charitable immunity. (*Silva, supra,* 14 Cal.2d at p. 776; *Simmons,* at p. 317; *Clark, supra,* 628 N.E.2d at pp. 51-52.)

The second impediment overcome was that created by the application of the traditional rules of respondeat superior to skilled professionals, such as physicians. "For many years the majority of courts followed the rule . . . that physicians, because of their skill and training in a highly technical field, were not subject to control by hospital lay boards and thus could not be servants or employees in the sense required by the doctrine of respondeat superior. Rather, physicians were classified as independent contractors with the result that the hospitals in which they labored could not be held

vicariously liable for their medical mistakes." (*Adamski v. Tacoma General Hospital* (1978) 20 Wash.App. 98 [579 P.2d 970, 974]; see also *Gilbert v. Sycamore Mun. Hosp.* (1993) 156 Ill.2d 511 [190 Ill.Dec. 758, 622 N.E.2d 788, 793] (*Gilbert*).)

Courts soon realized, however, that the traditional emphasis on the master's ability to control the servant was unrealistic in the context of the modern health care system. In an often cited passage, a New York court explained: "The conception that the hospital does not undertake to treat the patient, does not undertake to act through its doctors and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the fact. Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and internes, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of 'hospital facilities' expects that the hospital will attempt to cure him, not that its nurses or other employees will act on their own responsibility." (*Bing v. Thunig* (1957) 2 N.Y.2d 656 [163 N.Y.S.2d 3, 143 N.E.2d 3, 8]; see also *Gilbert, supra,* 622 N.E.2d at pp. 793-794; *Pamperin v. Trinity Memorial Hosp.* (1988) 144 Wis.2d 188 [423 N.W.2d 848, 855] (*Pamperin*).) In light of this modern reality, the overwhelming majority of jurisdictions employed ostensible or apparent agency to impose liability on hospitals for the negligence of independent contractor physicians. (For comprehensive lists, see *Sword v. NKC Hospitals, Inc.* (Ind. 1999) 714 N.E.2d 142, 150 (*Sword*); *Clark, supra,* 628 N.E.2d at p. 53.)

 Although the cases discussing ostensible agency use various linguistic formulations to describe the elements of the doctrine, in essence, they require the same two elements: (1) conduct by the hospital that would cause a reasonable person to believe that the physician was an agent of the hospital, and (2) reliance on that apparent agency relationship by the plaintiff. (See, e.g., *Sword, supra,* 714 N.E.2d at p. 151; *Pamperin, supra,* 423 N.W.2d at pp. 854, 856.)[2]

Regarding the first element, courts generally conclude that it is satisfied when the hospital "holds itself out" to the public as a provider of care.

---

[2]Many courts based ostensible agency on Restatement Second of Agency, section 267, or Restatement Second of Torts, section 429. (*Clark, supra,* 628 N.E.2d at p. 49.) Most courts distinguished the two sections (e.g., *Sword, supra,* 714 N.E.2d at p. 149), but others equated them (e.g., *Hill v. St. Clare's Hosp.* (1986) 67 N.Y.2d 72 [499 N.Y.S.2d 904, 490 N.E.2d 823, 828]). Because ostensible agency is defined by statute in California (Civ. Code, § 2300), we need not and will not attempt to interpret the Restatement sections.

(*Butler v. Domin* (2000) 302 Mont. 452 [15 P.3d 1189, 1196-1197] (*Butler*); *Sword, supra,* 714 N.E.2d at p. 151.) In order to prove this element, it is not necessary to show an express representation by the hospital. (*Butler*, at p. 1198; *Sword,* at p. 151; *Clark, supra,* 628 N.E.2d at pp. 52-53; *Gilbert, supra,* 622 N.E.2d at p. 796, reaffirmed in *Petrovich v. Share Health Plan of Illinois, Inc.* (1999) 188 Ill.2d 17 [241 Ill.Dec. 627, 719 N.E.2d 756, 766] (*Petrovich*); *Pamperin, supra,* 423 N.W.2d at pp. 854, 856; *Jackson v. Power* (Alaska 1987) 743 P.2d 1376, 1382, fn. 10 (*Jackson*), reaffirmed in *Ward v. Lutheran Hospitals & Homes Soc.* (Alaska 1998) 963 P.2d 1031, 1034, fn. 4 (*Ward*); *Adamski v. Tacoma General Hospital, supra,* 579 P.2d at p. 979.) Instead, a hospital is generally deemed to have held itself out as the provider of care, unless it gave the patient contrary notice. (*Butler*, at p. 1197; *Sword*, at p. 152; see also *Pamperin*, at pp. 856-857.) Many courts have even concluded that prior notice may not be sufficient to avoid liability in an emergency room context, where an injured patient in need of immediate medical care cannot be expected to understand or act upon that information. (*Simmons, supra,* 533 S.E.2d at p. 320; *Sword*, at p. 152; *Clark*, at p. 54, fn. 1.)

The second element, reliance, is established when the plaintiff "looks to" the hospital for services, rather than to an individual physician. (*Butler, supra,* 15 P.3d at p. 1196; *Simmons, supra,* 533 S.E.2d at p. 322; *Pamperin, supra,* 423 N.W.2d at p. 857; *Jackson, supra,* 743 P.2d at p. 1380.) However, reliance need not be proven by direct testimony. (*Clark, supra,* 628 N.E.2d at pp. 52-53; *Jackson*, at p. 1382, fn. 10; see also *Pamperin*, at p. 857 ["[I]f a person voluntarily enters a hospital without objecting to his or her admission to the hospital, then that person is seeking care from the hospital itself."].) In fact, many courts presume reliance, absent evidence that the plaintiff knew or should have known the physician was not an agent of the hospital. (*Butler*, at p. 1197; *Sword, supra,* 714 N.E.2d at p. 152; see also *Ward, supra,* 963 P.2d at pp. 1034-1035, fn. 5 ["In practice, however, few jurisdictions have required a showing of reliance."].)

As should be apparent to an astute observer, there is really only one relevant factual issue: whether the patient had reason to know that the physician was not an agent of the hospital. As noted above, hospitals are generally deemed to have held themselves out as the provider of services unless they gave the patient contrary notice, and the patient is generally presumed to have looked to the hospital for care unless he or she was treated by his or her personal physician. Thus, unless the patient had some reason to know of the true relationship between the hospital and the physician—i.e., because the hospital gave the patient actual notice or because the patient

was treated by his or her personal physician—ostensible agency is readily inferred.

Most courts have arrived at a similar conclusion. For instance, the Indiana Supreme Court observed that "[c]entral to both of these factors—that is, the hospital's manifestations and the patient's reliance—is the question of whether the hospital provided notice to the patient that the treating physician was an independent contractor and not an employee of the hospital." (*Sword, supra,* 714 N.E.2d at p. 151; see also *Butler, supra,* 15 P.3d at p. 1197 [adopting *Sword*].) And some courts have expressly concluded that the plaintiff's knowledge is the only relevant issue: "[A] hospital can be held vicariously liable for the negligent acts of a physician providing care at the hospital, regardless of whether the physician is an independent contractor, unless the patient knows, or should have known, that the physician is an independent contractor." (*Gilbert, supra,* 622 N.E.2d at p. 795; see also *Pamperin, supra,* 423 N.W.2d at pp. 855-856; *Grewe v. Mt. Clemens General Hospital* (1978) 404 Mich. 240 [273 N.W.2d 429, 433] (*Grewe*) ["In our view, the critical question is whether the plaintiff, at the time of his admission to the hospital, was looking to the hospital for treatment of his physical ailments or merely viewed the hospital as the situs where his physician would treat him for his problems."].) Other courts have commented that the burden of proving ostensible agency in the hospital context has been so relaxed that it amounts to a nondelegable duty. (*Ward, supra,* 963 P.2d at pp. 1034-1035, fns. 4-6; *Simmons, supra,* 533 S.E.2d at pp. 320-321.) The West Virginia Supreme Court even went so far as to conclude that a hospital is estopped to deny an agency relationship whenever it makes emergency room services available to the public. (*Torrence v. Kusminsky* (1991) 185 W.Va. 734 [408 S.E.2d 684, 692]; see also *Paintsville, supra,* 683 S.W.2d at p. 258 ["The circumstances under which the hospital is liable are not unlimited. But the operation of a hospital emergency room open to the public, where the public comes expecting medical care to be provided through normal operating procedures within the hospital, falls within the limits for application of the principles of ostensible agency and apparent authority."].)

This per se inference of ostensible agency actually follows logically from the evolution of the modern hospital described above. As the Ohio Supreme Court explained: "In applying the traditional elements [of ostensible agency] in this way, those courts invariably recognize the status of the modern-day hospital and its role in contemporary society. Not only is the hospital of today a large, well-run business, . . . but advances in medical technology have inevitably spawned increased specialization and industrialization. Hospitals are the only place where the best equipment and facilities and a full

array of medical services are available at any time without an appointment. With hospitals now being complex full-service institutions, the emergency room has become the community medical center, serving as the portal of entry to the myriad of services available at the hospital. As an industry, hospitals spend enormous amounts of money advertising in an effort to compete with each other for the health care dollar, thereby inducing the public to rely on them in their time of medical need. The public, in looking to the hospital to provide such care, is unaware of and unconcerned with the technical complexities and nuances surrounding the contractual and employment arrangements between the hospital and the various medical personnel operating therein. Indeed, often the very nature of a medical emergency precludes choice. Public policy dictates that the public has every right to assume and expect that the hospital is the medical provider it purports to be." (*Clark, supra,* 628 N.E.2d at p. 53; see also *Butler, supra,* 15 P.3d at p. 1197; *Gilbert, supra,* 622 N.E.2d at p. 794; *Pamperin, supra,* 423 N.W.2d at p. 855; *Hardy v. Brantley* (Miss. 1985) 471 So.2d 358, 370 [58 A.L.R.5th 929] ["The basic rationale . . . is that, unless there is some reason for a patient to believe that the treating physician in a hospital is an independent contractor, it is natural for him to assume that he can rely upon the reputation of the hospital as opposed to any doctor, which is the reason he goes there in the first place."]; *Paintsville, supra,* 683 S.W.2d at p. 258.) Or, as more recently explained by the South Carolina courts: " '[T]he hospital itself has come to be perceived as the provider of medical services. According to this view, patients come to the hospital to be cured, and the doctors who practice there are the hospital's instrumentalities, regardless of the nature of the private arrangements between the hospital and the physician. Whether or not this perception is accurate seemingly matters little when weighed against the momentum of changing public perception and attendant public policy.' " (*Simmons, supra,* 533 S.E.2d at p. 317.) Thus, because it is commonly believed that hospitals are the actual providers of care, ostensible agency can be readily inferred whenever someone seeks treatment at a hospital.

### b. *California Law*

■ In California, ostensible agency is defined by statute. Civil Code section 2300 provides: "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (See also Civ. Code, § 2317.) Civil Code section 2334 further provides: "A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof." Nominally, these statutes require proof of three elements: " '[First] [t]he person dealing with

the agent must do so with belief in the agent's authority and this belief must be a reasonable one; [second] such belief must be generated by some act or neglect of the principal sought to be charged; [third] and the third person in relying on the agent's apparent authority must not be guilty of negligence.' " (*Stanhope v. L. A. Coll. of Chiropractic* (1942) 54 Cal.App.2d 141, 146 [128 P.2d 705] (*Stanhope*).) Of course, at heart, these three elements are the same as the two elements discussed above: (1) conduct by the hospital that would cause a reasonable person to believe there was an agency relationship and (2) reliance on that apparent agency relationship by the plaintiff.

Ostensible agency was first applied to a hospital in California under circumstances remarkably similar to the instant case. In *Stanhope*, a large object fell on the plaintiff and he was rushed to the College of Chiropractic which was only two blocks from his home. (*Stanhope, supra,* 54 Cal.App.2d at p. 143.) The plaintiff had never been to the college before and knew no one associated with it. (*Ibid.*) After taking X-rays, a physician told the plaintiff that there were no broken bones. (*Ibid.*) A few days later, additional X-rays were taken and it was discovered that the plaintiff actually had a broken vertebra. (*Ibid.*) The college argued that it was not liable because the radiologist was not its employee or agent. (*Id.* at p. 144.) The *Stanhope* court relied on the theory of ostensible agency to reject that argument, reasoning: "So far as the record reveals [the college] did nothing to put [the plaintiff] on notice that the X-ray laboratory was not an integral part of [the college], and it cannot seriously be contended that [the plaintiff], when he was being carried from room to room suffering excruciating pain, should have inquired whether the individual doctors who examined him were employees of the college or were independent contractors. Agency is always a question of fact for the jury." (*Id.* at p. 146.) The *Stanhope* holding was subsequently adopted by the California Supreme Court in two other hospital liability cases involving negligent anesthesiologists. (*Quintal v. Laurel Grove Hospital* (1964) 62 Cal.2d 154, 167-168 [41 Cal.Rptr. 577, 397 P.2d 161]; *Seneris v. Haas* (1955) 45 Cal.2d 811, 831-832 [291 P.2d 915, 53 A.L.R.2d 124].)

Like the majority of the courts throughout the nation, *Stanhope* inferred ostensible agency from the mere fact that the plaintiff sought treatment at the hospital without being informed that the doctors were independent contractors. In that regard, *Stanhope* actually served as a springboard for the national trend set forth above, having been prominently cited by many of the seminal cases. (E.g., *Grewe, supra,* 273 N.W.2d at p. 434; *Adamski v. Tacoma General Hospital, supra,* 579 P.2d at p. 978 [relying on *Quintal, Seneris,* and *Stanhope*].) ▪ Thus, we believe that California law should be interpreted consistently with the national trend.

c. *Application to This Case*

■ In the instant case, respondent hospital was granted a nonsuit following the plaintiff's presentation of evidence. ■ Since motions for a nonsuit raise issues of law, the granting of a nonsuit is reviewed de novo on appeal, using the same standard as the trial court. (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541 [50 Cal.Rptr.2d 395].) " 'A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor.' [Citation.] In determining the sufficiency of the evidence, the trial court must not weigh the evidence or consider the credibility of the witnesses. Instead, it must interpret all of the evidence most favorably to the plaintiff's case and most strongly against the defendant, and must resolve all presumptions, inferences, conflicts, and doubts in favor of the plaintiff. If the plaintiff's claim is not supported by substantial evidence, then the defendant is entitled to a judgment as a matter of law, justifying the nonsuit." (*Ibid.*)

■ When this standard is applied to the case law governing ostensible agency in the hospital context, it appears difficult, if not impossible, for a hospital to ever obtain a nonsuit based on the lack of ostensible agency. Effectively, all a patient needs to show is that he or she sought treatment at the hospital, which is precisely what plaintiff alleged in this case. Unless the evidence conclusively indicates that the patient should have known that the treating physician was not the hospital's agent, such as when the patient is treated by his or her personal physician, the issue of ostensible agency must be left to the trier of fact.

Nevertheless, respondent hospital points to three facts that allegedly show that plaintiff failed to prove that the radiologist was an ostensible agent of the hospital. Considering each of these facts in turn, we find none of them to be relevant.

First, respondent hospital notes that plaintiff never even knew about the radiologist's involvement in her care. Instead, the radiologist dealt solely with the ER physician who subsequently advised plaintiff without mentioning the radiologist. There actually is some authority indicating that this fact is relevant. In *Garrett v. L.P. McCuistion Community Hosp.* (Tex.App. 2000) 30 S.W.3d 653, a Texas appellate court found that there was no proof that a hospital had held out a radiologist as its agent when the radiologist never directly met with, treated, or advised the patient. (*Id.* at p. 657.) However, this was based on the Texas requirement that a hospital take affirmative action to represent the physician as an agent (*ibid.*), a requirement that, as noted above, is at odds with the vast majority of the states, including

California, which assume that the physician appears to be an agent absent notice to the contrary. In fact, contrary to Texas law, California specifically allows for the creation of an ostensible agency by mere "want of ordinary care" (Civ. Code, § 2300), or "neglect" (*Stanhope, supra,* 54 Cal.App.2d at p. 146).

Furthermore, in precisely the same circumstances, the Oregon Court of Appeals recently concluded that such evidence is irrelevant. In *Jennison v. Providence St. Vincent Medical Center* (2001) 174 Or.App. 219 [25 P.3d 358] (*Jennison*), the Oregon court concluded that absent some indication to the contrary on a consent form, it was reasonable for a patient to assume that the person who ultimately interpreted the patient's X-rays was an employee of the hospital. (*Id.* at p. 367.) The Oregon court explained that although it normally required proof of actual reliance, that requirement was inappropriate in the hospital context because "in some cases, the patient might be so severely impaired as to be incapable of communicating or may not survive the negligent acts of an independent contracting physician. In those cases it would be nearly impossible to prove that the patient actually relied on the hospital's holding the physician out as an employee of the hospital. It would be incongruous to allow a patient who survives a negligent encounter relatively intact to recover because she or he is able to testify whether she or he actually relied, but not allow a severely impaired or deceased patient to recover because she or he is unable to recount what her or his actual belief was." (*Ibid.*)

We agree wholeheartedly with the sentiments expressed in *Jennison*, sentiments that are reflected in the *Stanhope* holding that emergency room patients cannot be expected to inquire as to whether treating physicians are independent contractors. (*Stanhope, supra,* 54 Cal.App.2d at p. 146.) Likewise, patients cannot be expected to inquire into the employment status of physicians they never met.

Second, respondent hospital notes that the radiologist was not actually selected by the hospital, but rather was scheduled by his direct employer, MSB Radiology. This fact is obviously irrelevant. As explained above, ostensible agency is based on appearances. Thus, the fact that a hospital actually contracts with an intermediary to hire and schedule physicians is only relevant if the patient had some reason to know about that arrangement. In this case, it is beyond dispute that plaintiff had no idea that the radiologist was actually employed and scheduled by MSB Radiology.

Third, respondent hospital notes that the only reason plaintiff went to this hospital was because it was the closest, not because it had a better reputation

than other hospitals. As a result, the hospital argues that plaintiff never changed her position in "reliance" on the hospital's reputation by selecting among competing hospitals. However, this argument misconstrues the nature of the reliance inquiry. In *Abdul-Majeed v. Emory University Hosp.* (1994) 213 Ga.App. 421 [445 S.E.2d 270], the hospital similarly argued that the plaintiff had failed to prove that she selected that hospital over other hospitals based on its reputation. The Georgia court rejected that argument, concluding that "[t]he relevant question here is not whether plaintiff relied on the hospital's reputation in choosing between [competing hospitals], but whether plaintiff relied on the hospital's representation that [the negligent physician] was its agent in accepting that doctor's services." (*Id.* at p. 272; see also *Scardina v. Alexian Bros. Medical Center* (1999) 308 Ill.App.3d 359 [241 Ill.Dec. 747, 719 N.E.2d 1150, 1154-1155] [plaintiff referred to hospital by personal physician].)

The Illinois Supreme Court rejected a similar argument in *Petrovich, supra,* 719 N.E.2d 756, where it extended the principles of ostensible agency to HMO's. In *Petrovich,* the HMO argued that the element of reliance had not been proven because the HMO was selected by the plaintiff's employer and the plaintiff had no choice in the matter. (*Id.* at p. 769.) The *Petrovich* court rejected that argument, concluding that even though the plaintiff may have had no choice among HMO's, the plaintiff still relied on the defendant HMO to provide medical care. (*Ibid.*)

The Ohio Supreme Court was confronted with a similar argument in *Clark, supra,* 628 N.E.2d 46, where it overruled a prior narrow interpretation of ostensible agency. The plaintiff in *Clark* argued "in conciliatory fashion" that if the court chose not to revisit its existing ostensible agency jurisprudence, then it could find proof of actual reliance based on the fact that the plaintiff drove past one hospital to get to the defendant hospital. (*Id.* at p. 50.) The *Clark* court rejected the offer, noting: "If we were to do as [the plaintiff] suggests, then the outcome would be different had she suffered the asthma attack at a place geographically closer to [the defendant hospital] than to [another hospital]. It is disconcerting at best that the fortuity of geographic proximity should determine the outcome under a doctrine so deeply rooted in public policy." (*Ibid.*)

In conclusion, absent evidence that plaintiff should have known that the radiologist was not an agent of respondent hospital, plaintiff has alleged sufficient evidence to get to the jury merely by claiming that she sought treatment at the hospital.

## DISPOSITION

The judgment is reversed. Plaintiff shall recover costs on appeal.

Richli, J., and Gaut, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 2, 2002. Baxter, J., Chin, J., and Brown, J., were of the opinion that the petition should be granted.