Filed 5/17/13  Root v. Emeritus Corp. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **JOYCE ROOT et al.,**<br><br>    **Plaintiffs and Respondents,**<br><br>**v.**<br><br>**EMERITUS CORPORATION AND EMERITUS AT WESTWIND GARDENS,**<br><br>    **Defendants and Appellants.** | **A134748**<br><br>**(Solano County Super. Ct. No. FCS038463)** |

Emeritus Corporation and Emeritus at Westwind Gardens appeal from an order denying their petition to compel the arbitration of claims brought against them by respondents Joyce Root et al., as successors in interest to Geneva Benthin, a deceased former resident at Westwind Gardens.  Appellants had based their petition on an arbitration agreement purportedly signed on Benthin's behalf pursuant to a uniform statutory form power of attorney and a health care power of attorney in a California advance health care directive.  Appellants contend the court erred in:  (1) ruling that the powers of attorney, which were neither notarized nor acknowledged by witnesses, were invalid; (2) finding there was insufficient evidence that the arbitration agreement was signed by an ostensible agent; and (3) denying appellants' request for a continuance of the hearing to conduct discovery on the validity of the powers of attorney.

We will affirm the order.

1

## I. FACTS AND PROCEDURAL HISTORY

Appellant Emeritus at Westwind Gardens is a residential care facility for the elderly that is managed and operated by appellant Emeritus Corporation. In California, a residential care facility for the elderly is a housing arrangement in which 75 percent of the residents are at least 60 years old and staff provides varying levels of care and supervision. (Cal. Code Regs., tit. 22, § 87101, subd. (r)(5).)

Geneva Benthin (Benthin) lived at Emeritus at Westwind Gardens for about two years before her death in September 2010 at the age of 94. For convenience and consistent with the parties' practice, we will refer to Emeritus at Westwind Gardens and Emeritus Corporation collectively as "Emeritus."

A. *Agreements and Powers of Attorney*

As part of the paperwork for Benthin's admission to Emeritus in August 2008, Benthin's daughter, Joyce Root, signed a Resident Agreement and checked two boxes on the agreement indicating that Root was the responsible party and had power of attorney to act on Benthin's behalf.

On that same day, Root also signed an "Agreement to Resolve Disputes by Binding Arbitration" (Arbitration Agreement) as Benthin's "authorized representative." In pertinent part, the Arbitration Agreement stated: "[A]ny action, dispute, claim, or controversy of any kind, whether in contract or in tort, statutory or common law, personal injury, property damage, legal or equitable or otherwise, arising out of the provision of assisted living services, healthcare services, or any other goods or services provided under the terms of any agreement between the Parties, including disputes involving the scope of this Arbitration Agreement, or any other dispute involving acts or omissions that cause damage or injury to either Party, except for matters involving evictions, shall be resolved exclusively by binding arbitration and not by lawsuit or resort to the judicial process, except to the extent that applicable law provides for judicial review of arbitration proceedings. To the fullest extent permitted by law, this Arbitration Agreement shall apply to third parties not signatories to this Agreement, including any spouse, heirs, or persons claiming through the Resident."

The Arbitration Agreement specified that it would be governed by the Federal Arbitration Act (9 U.S.C., §§ 1-16) and that arbitration would be administered by the National Arbitration Forum. In addition, the Arbitration Agreement advised, "[a]dmission to the Community is not contingent upon signing this agreement."

Root also presented Emeritus with two powers of attorney: a "Uniform Statutory Form Power of Attorney" and a "California Advance Health Care Directive Including Power of Attorney for Health Care." The documents were purportedly signed by Benthin, but Benthin's signature on them was neither notarized nor acknowledged by witnesses.

The uniform statutory form power of attorney was purportedly signed by Benthin on September 6, 2007. According to this form, Benthin appointed Root as her attorney-in-fact with respect to a broad variety of matters, including "personal and family maintenance." The power of attorney indicated Benthin's agreement that a third party receiving a copy of the power of attorney could "act under it."

The California advance health care directive, including a health care power of attorney, was also purportedly signed by Benthin on September 6, 2007. According to this document, Benthin appointed Root as her agent to make medical and health care decisions for her when Benthin lacked the mental capacity to make them. Attached to the power of attorney is a form ostensibly disclosing Benthin's health care preferences.

B. *Respondents' Lawsuit*

Around 5:50 a.m. on September 7, 2010, Benthin fell on Emeritus' premises and suffered terminal injuries. She died four days later.

Benthin's successors-in-interest – respondents Root, Donna Morgan, and Elnora Good – sued Emeritus for damages, asserting causes of action for elder abuse, fraud, wrongful death, and violation of Health & Safety Code section 123110 (requiring provision of copies of medical records). Respondents alleged that Emeritus left Benthin outside and unattended in the dark and on wet pavement in the facility's courtyard, despite knowing that she was confused and disoriented, had a history of falls and an unsteady gait, was visually impaired, needed assistance of a walker, and suffered from advanced dementia and

3

osteoporosis.  Benthin fell, suffering a laceration, multiple brain contusions and intracranial bleeding, and fractures to her frontal bone, right hip, right ribs and right femur.  Found lying in a pool of blood, she was transported by ambulance to a hospital, where she later died.

C. *Emeritus' Petition to Compel Arbitration*

In October 2011, Emeritus filed a petition to compel arbitration of the claims in respondents' complaint, setting a hearing date for four months later in February 2012. Emeritus based its petition on the Resident Agreement, the Arbitration Agreement, and the powers of attorney; Emeritus attached these documents to a declaration of its counsel, who had no personal knowledge of their execution.

Respondents opposed the petition, arguing that Emeritus failed to establish a valid agreement to arbitrate because the powers of attorney were invalid.  Respondents also argued that the Arbitration Agreement was not properly authenticated, it could not be enforced because the named arbitration forum was shut down, the agreement was unconscionable, and arbitration would result in inconsistent rulings.

In reply, Emeritus argued, among other things, that the Arbitration Agreement was valid and that Root in any event had ostensible authority to sign the agreement based on her own statements and the invalid powers of attorney Benthin purportedly signed.

D. *Denial of Petition to Compel Arbitration*

At the hearing on Emeritus' motion, Emeritus argued that it believed there was a valid power of attorney somewhere in existence – that is, one that was witnessed or notarized – but not all of the pages had been provided to Emeritus when Benthin was admitted.  The trial court asked Emeritus' attorney if she needed time to conduct discovery on the issue, and counsel requested that the hearing be continued, "if necessary," so Emeritus could depose Root and have her "produce the durable power of attorney."  The court acknowledged that it "would be extremely important to the court to know" whether the power of attorney was valid.  When asked about Emeritus' request for additional time to conduct discovery, respondents' attorney stated, "[t]hat would be fine," but claimed there

4

were other issues that compelled denial of Emeritus' petition. The court took the matter under submission.

By written order filed on February 23, 2012, the court denied Emeritus' petition to compel arbitration. The court found that Emeritus failed to establish the existence of an arbitration agreement, because the September 2007 power of attorney was invalid under the Probate Code, in that it was neither notarized nor acknowledged by witnesses. (Citing Prob. Code, §§ 4401, 4402, 4121.) The court also rejected Emeritus' argument that Root signed the Arbitration Agreement as Benthin's ostensible agent, because "the only evidence of any act by Geneva Benthin that would suggest she authorized Root to act on her behalf is her signing of the power of attorney," but "because the power of attorney is invalid, the court cannot find an ostensible agency was created based on this document[, and to] do so would render meaningless all of the requirements set out in Probate Code Sections 4401, 4402, and 4121." The court did not rule on respondents' alternative grounds for the denial of the petition.

Emeritus now appeals from the order denying its petition to compel arbitration. (See Code Civ. Proc., § 1294, subd. (a).)

## II. DISCUSSION

Emeritus sets forth the following issues on appeal: (1) whether the court erred in determining that the powers of attorney were invalid; (2) whether the court erred in ruling that no ostensible agency was created; and (3) whether the court erred in declining to grant Emeritus' request for a continuance.

On appeal from the denial of a petition to compel arbitration, where the facts are undisputed, we review the arbitration agreement de novo to determine whether it is legally enforceable, applying general principles of California contract law. (*Baker v. Osborne Development Corp.* (2008) 159 Cal.App.4th 884, 892; *Mitri v. Arnel Management Co.* (2007) 157 Cal.App.4th 1164, 1170.) Here, the threshold question is whether the Arbitration Agreement is legally enforceable against Benthin (and therefore her successors); more particularly, whether Emeritus established the existence of an arbitration agreement with Benthin, in that Root had the authority to bind Benthin by signing the Arbitration

5

Agreement on her behalf. (See *Flores v. Evergreen at San Diego, LLC* (2007) 148 Cal.App.4th 581, 586 [party seeking to compel arbitration has the burden of proving the existence of a valid arbitration agreement] (*Flores*).) Emeritus' two theories in this regard are that: (1) Root had such authority under the powers of attorney, because they were valid; and (2) Root had such authority as Benthin's ostensible agent. We address these theories in turn.

A. *Validity of Powers of Attorney*

Uniform statutory form powers of attorney are governed by Probate Code section 4402. Probate Code section 4402 provides that "a statutory form power of attorney under this part is legally sufficient if all of the following requirements are satisfied . . . *The signature of the principal is acknowledged.*" (Prob. Code, § 4402, subd. (c), italics added.) In the matter before us, however, there is no dispute that Benthin's signature on the statutory form power of attorney was not acknowledged.

The parties assumed in the trial court and their appellate briefs that the health care power of attorney in California's advance health care directive is governed by Probate Code section 4121, which applies to special or limited powers of attorney. Under Probate Code section 4121, a power of attorney is legally sufficient if "[t]he power of attorney is either (1) acknowledged before a notary public or (2) signed by at least two witnesses who satisfy the requirements of Section 4122." (Prob. Code, § 4121, subd. (c).) In our view, however, a power of attorney for health care in an advance health care directive is governed by Probate Code sections 4680 et seq. (See Prob. Code, § 4050, subd., (a)(1) [Division 4.5 is inapplicable to powers of attorney for health care governed by Division 4.7, commencing with § 4600], § 4671.) Those sections have the same requirement as Probate Code section 4121: to be legally sufficient, a written power of attorney for health care must be acknowledged before a notary public or signed by at least two qualifying witnesses. (Prob. Code, §§ 4680, 4673, subd. (a)(3).) Here, it is undisputed that Benthin's heath care power of attorney was neither acknowledged by a notary or signed by the requisite witnesses.

6

Under the Probate Code, therefore, the powers of attorney submitted to Emeritus were invalid. (*Kaneko v. Yager* (2004) 120 Cal.App.4th 970, 979 [special power of attorney was invalid under Probate Code, § 4121, subd. (c), where it was neither witnessed nor notarized] (*Kaneko*); *Title Trust Deed Service Co. v. Pearson* (2005) 132 Cal.App.4th 168, 179, fn. 4 [settlement agreement signed by wife was not enforceable where husband's power of attorney in wife's favor was neither witnessed nor notarized and was therefore invalid].)

Emeritus argues that the powers of attorney were nonetheless valid simply because Benthin signed them, as the fact of her signature evinced her intent for Root to possess the enumerated powers. Drawing on language from *Torres v. Torres* (2006) 135 Cal.App.4th 870 at pages 876-877 (*Torres*), Emeritus adds: "Although a notary page is missing from the documents given to Emeritus, '[i]t seems highly unlikely [Benthin] intended to sign a document which lacked purpose and legal effect.' [Citation.]."

To the extent Emeritus is arguing that Benthin's signature was sufficient to make the powers of attorney *themselves* valid, its argument is untenable. Probate Code sections 4402, 4121, and 4673 expressly provide to the contrary. And nothing in *Torres* compels a different conclusion: *Torres* involved a power of attorney that was found valid because, although it did not substantially comply with the statutory form for powers of attorney, it did substantially comply with California law governing the creation of powers of attorney as set forth in the Probate Code, *including* the requirement that the power of attorney be "acknowledged before a notary public." (*Torres, supra*, 135 Cal.App.4th at p. 876.) It is undisputed that the powers of attorney presented to Emeritus, unlike the power of attorney in *Torres*, did not meet this statutory requirement.

A slightly different argument is that Benthin's execution of the powers of attorney, while insufficient to make the powers of attorney valid, could still serve as extrinsic evidence that Benthin intended for Root to sign agreements like the Arbitration Agreement, and on that basis it could be said that Root's signature bound Benthin under the Arbitration Agreement. But this argument we also find unpersuasive. To accept Emeritus' position would improperly circumvent the requirements and purposes of

7

Probate Code sections 4402, 4121, 4680 and 4673, since it would permit health care and other decisions to be made based on the principal's alleged signature alone, without the safeguards of a witness acknowledgement or notarization (or other indicia of authorization, discussed *post*). This is plainly contrary to the legislature's intent: "The requirement the power of attorney be in writing and acknowledged before a notary or two witnesses 'is intended to provide a protective level of formality' to the execution of the document." (*Torres, supra*, 135 Cal.App.4th at p. 877.)

Emeritus reminds us of the public policy favoring arbitration of disputes and, citing *Cione v. Foresters Equity Services, Inc.* (1997) 58 Cal.App.4th 625 (*Cione*) at page 642, urges that Benthin's intentions should be "generously construed as to issues of arbitrability." Emeritus' argument is unconvincing. In the first place, *Cione* is distinguishable, because in that case the plaintiff had personally signed the contract containing the arbitration clause, so the only question was the scope of the arbitration provision. Here, by contrast, the question is not the scope of the Arbitration Agreement, but the threshold question of whether Benthin (and her successors) are bound by it. Moreover, while it is true that public policy generally favors arbitration, claims may be arbitrated only to the extent the parties have *agreed* they should be arbitrated. (*Ajamian v. CantorCO2e* (2012) 203 Cal.App.4th 771, 780-781; *Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744.)

Lastly, Emeritus argues that the trial court erred in analyzing only one power of attorney purportedly signed by Benthin, since Emeritus presented two powers of attorney. In our view of the court's order, however, the court did not necessarily consider only one of the two powers of attorney, since the court cited both Probate Code sections 4401 and 4402 (pertaining to statutory form powers of attorney) *and* Probate Code section 4121 (which the parties cited as pertaining to the health care power of attorney in the advance health care directive). In any event, as a matter of law neither power of attorney was valid in light of the statutory requirements, so neither could justify enforcement of the Arbitration Agreement whether the court considered them both or not.

The court did not err in concluding that the power(s) of attorney were invalid and provided no basis for enforcement of the Arbitration Agreement.

B. *Ostensible Agency*

Where the statutory requirements for a power of attorney are not met – and therefore no actual agency has been established on that basis – a principal may still be bound to an arbitration agreement under general agency principles, including the theory of ostensible agency. (*Flores, supra,* 148 Cal.App.4th at p. 587 [when agent lacks written agency authorization to enter into an arbitration agreement, an agency relationship may still arise by oral consent or by implication from the parties' conduct]; see generally Civ. Code, § 2298 [agency can be actual or ostensible].)

Agency "is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (Civ. Code, § 2300.) The agency is created based upon the *principal's* conduct that causes a third party to *reasonably* believe the agent has authority to act. (*Tomerlin v. Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 643; see Civ. Code, § 2334 ["A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof"].) There are, therefore, two essential requirements for an ostensible agency: (1) conduct by the principal that would cause a reasonable person to believe there was an agency; and (2) reasonable reliance on that apparent agency by the third party. (*Mejia v. Community Hospital of San Bernardino* (2002) 99 Cal.App.4th 1448, 1457.)

Here, the trial court did not err in ruling that Root was not Benthin's ostensible agent when she signed the Arbitration Agreement. As the court noted, whether an ostensible agency exists depends on the acts of the principal, and the only act by Benthin indicating she authorized Root to be her agent was Benthin's purported signature on the powers of attorney. The trial court observed that, because the powers of attorney are invalid as a matter of law, they could not constitute sufficient evidence of an ostensible agency, because such a conclusion would negate the requirements of the applicable Probate Code sections.

Moreover, we would add, Emeritus did not establish that it held a *reasonable* belief that Benthin had made Root her agent for the purpose of signing the Arbitration Agreement, since Emeritus' only cognizable basis for that belief were powers of attorney that were *invalid on their face*.

Emeritus insists it had a reasonable belief in Root's authority because Root *said* she had a power of attorney and presented the two powers of attorney during the admission process. Again, however, what *Root* did or said does not suffice. (*Flores, supra,* 148 Cal.App.4th at pp. 587-588 [agent's acts alone are insufficient for creation of ostensible agency].) What counts is what Benthin said or did, which amounts to her purported execution of the powers of attorney. (See *id*. at p. 588.) And since the powers of attorney that Root presented were facially invalid – indeed, the absence of witness signatures or notarization brought into question whether the powers of attorney bore Benthin's signature at all – Emeritus fails to show that its belief was reasonable.

Emeritus' reliance on *Tutti Mangia Italian Grill, Inc. v. American Textile Maintenance Co.* (2011) 197 Cal.App.4th 733 (*Tutti Mangia*) is misplaced. There, the trial court found that an employee with the title of General Manager had ostensible authority to enter into a contract containing an arbitration agreement on behalf of his employer. (*Id.* at p. 743.) The court of appeal affirmed, concluding there was substantial evidence to support the finding because the employee had signed the agreement as the employer's "General Manager" and there was testimony that the employee was holding himself out as the General Manager with authority to sign. (*Ibid.*) In *Tutti Mangia*, however, there was no dispute that *the employer had made the employee General Manager*, and general managers have authority to enter into contracts on their employer's behalf. (*Id*. at pp. 736, 743.) By no means did *Tutti Mangia* hold that an ostensible agency can arise where the principal had *not* done something that reasonably suggested an agency.

Emeritus' reliance on *Jacoves v. United Merchandising Corp.* (1992) 9 Cal.App.4th 88 is also misplaced. There, a hospital's designation of a doctor as a director of its adolescent psychiatric unit and its provision of releases for the doctor on its admissions forms created a reasonable inference that the hospital caused patients to believe the doctor

10

was the hospital's ostensible agent, sufficient to create a triable factual issue and preclude summary judgment. (*Id*. at pp. 103-104.) But that has nothing to do with whether ostensible agency may arise from powers of attorney that are invalid under the Probate Code.

Nor is Emeritus helped by *White v. Moriarty* (1993) 15 Cal.App.4th 1290 (*White*), another case it cites. In *White*, the court held that the principal's execution of a power of attorney, his admitted knowledge that the agent would use that power, and his ratification of the agent's prior acts, constituted sufficient evidence of ostensible authority to bind the principal to certain transactions. (*Id*. at pp. 1293-1296.) Unlike the matter before us, however, in *White* there was no question that the power of attorney was valid; the issue in *White* pertained merely to the scope of the agency, not its creation. (*Id*. at p. 1295.)

Emeritus also argues it was not negligent in believing that Root was Benthin's agent, because requiring Emeritus to "demand a notary page during the admission process . . . would require Emeritus's admitting clerk to be an expert on all legal facets of arbitration agreements and powers of attorney." Emeritus' argument is untenable. Emeritus' admitting clerk would not need to be trained to do anything more than to look to see if a power of attorney bears the signatures of witnesses or a notarization. That does not seem too much to ask of a residential care facility for the elderly or the staff member it assigns to enter into residency agreements on its behalf. And the idea that Emeritus should require notarization or witness signatures before relying on the power of attorney to accept a new resident seems to be a very good one indeed, since it would help Emeritus to know if the person acting on behalf of the prospective resident actually has the authority to do so.

Finally, Emeritus argues that it reasonably believed that a notary page existed because Benthin signed the health care power of attorney under the instruction, "Sign the document in the presence of the witnesses or the Notary." In our view, however, this verbiage in the power of attorney just makes it all the more unreasonable for Emeritus to have relied on Root's representation of agency. If Emeritus did indeed look at that

11

language, it would have been naturally led to inquire, "so where are the witnesses' signatures or notarization"?

Emeritus fails to establish error on this ground.[1]

C. *Request for Continuance*

At the hearing on its motion to compel arbitration, Emeritus' attorney announced her belief that, although Emeritus' copy of the power of attorney lacked an acknowledgement or notarization page, respondents might have a power of attorney with the page attached. On that basis, Emeritus requested for the first time a continuance of the hearing it had set on its own motion, in order to conduct discovery. Emeritus argues it was error for the court not to grant this eleventh-hour request, particularly since respondents' attorney did not object, the court acknowledged it was important to know whether the power of attorney was valid, and doubts must be resolved in favor of arbitration. We review for an abuse of discretion. (E.g., *Pham v. Nguyen* (1997) 54 Cal.App.4th 11, 17 (*Pham*).)

The court did not err in proceeding to rule on Emeritus' petition without granting its request for a continuance. Emeritus was the party that had filed the petition to compel arbitration based on an arbitration agreement that, on its face, could not be enforced unless the signatory had authority to sign it on Benthin's behalf. Before even filing the motion,

---

[1]     Emeritus also invokes the doctrine of equitable estoppel, maintaining that Root relied upon the powers of attorney to admit Benthin into Emeritus' facility, so Root and the other respondents cannot now claim that the powers of attorney are invalid. (Citing *NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 84; *Halperin v. Raville* (1986) 176 Cal.App.3d 765, 772.) The argument is unavailing. First, Emeritus barely mentioned this theory in the trial court, and the record is not sufficiently developed for us to review the adequacy of the evidence that would be needed to establish the factual elements of equitable estoppel. Second, even if Root could be estopped on this basis, the other respondents cannot, without at least an indication that they too represented that Root was Benthin's agent. Third, equitable estoppel requires a showing that the party seeking the estoppel was actually and *permissibly* ignorant of the truth and induced to rely on the other party's representation or concealment. (*Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 584-585.) As discussed *ante* in the context of ostensible agency, based on the record before us, Emeritus' reliance on Root's presentation of the powers of attorney was not reasonable, since the powers of attorney by which Root claimed her authority were invalid on their face.

therefore, Emeritus should have considered whether the powers of attorney it was relying upon were valid – namely, whether they were acknowledged by witnesses or notarized. Upon finding that the powers of attorney in Emeritus' own files had no witness signatures or notarization, Emeritus could have sought leave to conduct its requested discovery before filing its motion to compel arbitration – or at least within the four months between the time it filed its petition and the hearing.

Emeritus points out that unilaterally conducting discovery on the *merits* before the hearing might have waived Emeritus' right to arbitrate. But surely no waiver could have been implied if Emeritus had obtained court permission to conduct discovery limited to the issue of the validity of the powers of attorney in connection with the existence and enforceability of the Arbitration Agreement: obviously if a court can continue the hearing to allow a party to engage in such limited discovery (as Emeritus requests), it can also permit such discovery *before* the hearing without a waiver of arbitration resulting. It was not an abuse of discretion for the court to deny Emeritus' request for a continuance on the ground that its delay in seeking discovery was unjustified and unreasonable.

Emeritus' contentions in this regard are unavailing. Although respondents' attorney did not object to the proposed continuance, that did not strip the court of discretion to conclude there was no good cause for the continuance, given the totality of the circumstances. (See *Pham, supra*, 54 Cal.App.4th at pp. 14, 17-18 [order denying *stipulated* continuance request is reviewed for abuse of discretion].) Similarly, while the court indicated it was important to know if the power of attorney was valid, the court's statement certainly did not absolve Emeritus of having to establish this fact within the time frame Emeritus had set for its motion.

Emeritus repeats its argument that doubts as to whether parties have agreed to arbitrate a dispute must be resolved in favor of compelling the matter to arbitration. (*Cione*, *supra,* 58 Cal.App.4th at p. 642). In light of the heavy presumption favoring arbitration, it argues, a court should deny a petition to compel arbitration only where it " ' " ' "may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." ' " ' " (*Ibid*.) The question here,

13

however, is not whether arbitration should be compelled because a dispute arguably falls within the scope of an arbitration clause, but whether Emeritus could delay the proceedings by engaging in discovery on matters that should have been addressed before it even brought its motion.

Emeritus also contends there was adequate reason to continue the hearing because it sees a good chance that discovery will indeed reveal a valid power of attorney. In particular, Emeritus argues, a notary page might well exist because Benthin signed the healthcare directive (which included a power of attorney for healthcare) under the written instruction to "[s]ign the document in the presence of the witnesses or the Notary." Emeritus also notes that respondents did not submit a declaration averring that the powers of attorney were *not* notarized or acknowledged by witnesses. The fact remains, however, that no matter how fruitful Emeritus might think the discovery will be, Emeritus had plenty of time to seek it before the hearing on the petition. Emeritus has not shown that the trial court was irrational or arbitrary in declining to continue the hearing.[2]

In the final analysis, the trial court did not abuse its discretion in failing to order a continuance of the hearing to allow Emeritus discovery on the validity of the powers of attorney. As respondents' attorney indicated at the hearing on Emeritus' petition, the issue before the court was whether the documents Emeritus had presented in support of its petition were sufficient to establish a valid power of attorney, not whether the powers of attorney were, in fact, notarized or signed by the requisite witnesses and thus valid.

Emeritus has failed to establish error in the trial court's order.

D. *Respondents' Other Arguments*

Respondents argue that the court's ruling can be affirmed on alternate grounds: the arbitration forum referenced in the Arbitration Agreement has been shut down; the Arbitration Agreement is unconscionable and thwarts respondents' ability to vindicate their statutory rights; and since most of the parties to this action are not parties to the

---

[2]     Emeritus also argues that Benthin possibly told Emeritus' staff to deal only with Root. Emeritus does not explain why it would need to postpone its hearing and conduct discovery to find out what was said to its own staff.

14

Arbitration Agreement, there is a risk of inconsistent rulings in different forums. Because we conclude that the trial court did not err in denying the petition to compel arbitration on the grounds cited by the court, we need not and do not decide any issue concerning these alternative grounds for the denial.

## III.  DISPOSITION

The order is affirmed.

_____

NEEDHAM, J.

We concur.

_____

JONES, P. J.

_____

BRUINIERS, J.

15