STATE OF MAINE                          SUPERIOR COURT
CUMBERLAND, ss.                         LOCATION: PORTLAND
                                        CIVIL ACTION
                                        DOCKET NO.    CV-2020-047

KRISTEN A. ARSENAULT,           )
PERSONAL REPRESENTATIVE OF      )
THE ESTATE OF WENDELL A.        )
ARSENAULT                       )
                                )
            Plaintiff           )       ORDER ON DEFENDANT MID COAST
                                )       HOSPITAL'S MOTION FOR
        v.                      )       SUMMARY JUDGMENT
                                )
MID COAST HOSPITAL AND          )
BLUEWATER EMERGENCY             )
PARTNERS, LLC.                  )
                                )
            Defendants

Before the court is Defendant Mid Coast Hospital's ("MCH") Motion for Summary

Judgment brought pursuant to Maine Rule of Civil Procedure ("M.R. Civ. P.") 56. For the

reasons set forth herein, the Motion is GRANTED IN PART and DENIED IN PART.

**FACTUAL BACKGROUND**

**I.  Wendell Arsenault's Treatment**

Wendell A. Arsenault ("Mr. Arsenault") passed away on February 10th, 2016.

(Defendant's Statement of Material Facts ("Def' s S.M.F.") ¶ 39.) This case involves the medical

care he received in the months preceding his passing.

On September 13th, 2015, Mr. Arsenault, then 67 years old, drove his motor vehicle over

a curb, hit a pole, and drove away when a bystander came to check on him — eventually

colliding with another vehicle further down the road. (Def.'s S.M.F. ¶ 15.) Once medical

personnel arrived on scene, Mr. Arsenault did not recall hitting the pole or the other vehicle, and

STATE OF MAINE
Cumberland, ss. Clerk's Office

FEB 2 2 2022

RECEIVED

was taken in an ambulance to MCH. (Def.'s S.M.F. ¶ 16.) Mr. Arsenault presented to the emergency department at MCH with acute and sudden mental status changes. (Plaintiff's Additional Statement of Material Facts ("Pl.'s A.S.M.F.") ¶ 2.)

Upon arrival at MCH, Mr. Arsenault was initially examined by a nurse who conducted a detailed assessment of his condition. (Pl.'s A.S.M.F. ¶¶ 3, 5.) This assessment was reviewed by Dr. Charles Markowitz ("Markowitz") an emergency medicine physician who then conducted his own evaluation of Mr. Arsenault. (Def.'s S.M.F. ¶ 24.) Based on this evaluation, Markowitz ordered Mr. Arsenault to undergo computed tomography ("CT") imaging of his head. (Def.'s S.M.F. ¶ 25.) After the exam, a radiologist interpreted the imaging and reported that the scans demonstrated diseased cerebral tissue most characteristic in appearance to malignancy or, less likely, to a small cerebral abscess with surrounding inflammation of the cerebral tissue. (Def.'s S.M.F. ¶ 25.) Based upon these findings, the radiologist recommended follow up magnetic resonance imaging ("MRI"). (Def.'s S.M.F. ¶ 26.) Despite the radiologist's recommendation, Mr. Arsenault did not receive an MRI and was discharged by Markowitz with instructions to follow up with his primary care physician, obtain an MRI and undergo further evaluation. (Def.'s S.M.F. ¶ 27.)

While at MCH on the 13th, and the next morning, September 14th, when he attended a physical therapy appointment at MCH's Parkview Therapy Center, Mr. Arsenault signed a standardized consent to treatment form.[1] (Def.'s S.M.F. ¶¶ 17, 28.)

---

[1] The form stated, in relevant part:

> "I authorize Mid Coast Health Services, its health care practitioners and staff, to examine me and perform any tests, procedures and/or treatment that may be helpful to care for my injury or illness.
>
> . . .
>
> I understand that many of the physicians on staff at Mid Coast Health Services, including some attending physicians, are not employees or agents of the hospital, but rather, are independent contractors who have been granted the privilege of using the facilities for the care and treatment of their patients." (Pl.'s Resp. Def.'s S.M.F. ¶ 17.)

Five days after his initial visit to the emergency room, Mr. Arsenault returned on September 18th, 2015 complaining of left sided weakness and a headache. (Def.'s S.M.F. ¶ 31.) After examining Mr. Arsenault, a physician ordered further CT imaging which revealed a "mass with a large amount of surrounding edema" that had "grown in size . . . since the prior study five days ago." (Def.'s S.M.F. ¶ 34.) Mr. Arsenault was then transferred to Maine Medical Center where he underwent an MRI and was diagnosed with a brain abscess. (Def.'s S.M.F. ¶ 35.) After a surgical procedure to remove and drain the abscess, Mr. Arsenault remained in the hospital for six weeks and was never able to recover normal functioning. (Def.'s S.M.F ¶ 37.) On October 30th, 2015, he was moved to a nursing home where he later passed. (Def.'s S.M.F. ¶ 38.)

Kristen A. Arsenault brought suit against Mid Coast Hospital, Bluewater Emergency Partners, LLC, and Martin's Point Healthcare in her capacity as personal representative of Mr. Arsenault's estate ("Plaintiff" or "Arsenault").[2] (Def.'s S.M.F. ¶ 40.) Count II of Arsenault's negligence action alleges that "Dr. Markowitz was an employee, and/or agent of MCH and was acting within the course and scope of his employment and/or agency with MCH and that MCH is therefore vicariously liable for the negligence of Dr. Markowitz." (Def.'s S.M.F. ¶ 40.)

## II. Bluewater Emergency Partners, LLC and MCH Relationship

In 2009, MCH contracted with Maine Coastal Emergency Physicians, P.A., to provide licensed physicians to MCH, ensuring that MCH's emergency department would be staffed twenty four hours per day. (Def.'s S.M.F. ¶ 1.) Coastal Maine Emergency Physicians, P.A. then assigned this contract to Bluewater Emergency Partners, LLC ("Bluewater") on January 1st, 2014. (Def.'s S.M.F. ¶ 2.)

---

[2] Martin's Point is no longer a party to this action. They were dismissed pursuant to this court's order issued on February 26th, 2021 granting Plaintiff's motion brought pursuant to Maine Rule of Civil Procedure 41(a)(2) seeking to dismiss all claims against Martin's Point.

The relationship between Bluewater and MCH is governed by a Professional and Administrative Services Agreement ("Agreement") that provides for Bluewater to staff MCH's Emergency Department with both physician and non-physician providers. (Def.'s S.M.F. ¶ 4.) The Agreement identifies Bluewater "as an independent contractor" and provides that "no [Bluewater] physician is an employee of the hospital." (Def.'s S.M.F. ¶ 8.) Bluewater's Physician and non-physician providers who staff MCH's Emergency Department must abide by MCH's general policies and procedures when treating patients but are free to exercise their own independent medical judgment when determining the proper course of treatment for their patients. (Def.'s S.M.F. ¶ 10.) This means that Bluewater providers can order appropriate imaging and testing they believe is needed, freely obtain consultations from other specialties, and transfer patients to a higher level of care if necessary. (Def.'s S.M.F. ¶ 11.) On the date of his alleged negligence in discharging Mr. Arsenault without an MRI, Markowitz was an employee of Bluewater. (Def.'s S.M.F. ¶ 20.)

MCH provides a number of support services to Bluewater, including maintenance of all equipment and supplies for the emergency department. (Pl.'s A.S.M.F. ¶ 20.) MCH also provides housekeeping, laundry, utility, information technology, human resource, billing, and electronic medical record services to Bluewater's providers. (Pl.'s A.S.M.F. ¶¶ 21, 22, 36.)

The medical director of the emergency department at MCH is a Bluewater employee, while the executive director of the emergency department is an MCH employee. (Pl.'s A.S.M.F. ¶¶ 32, 34.) The executive director has oversight of all non-Bluewater employees and has control over the emergency department's operations, including the budgeting and policy making process. (Pl.'s Resp. Def.'s S.M.F. ¶ 13.) The medical director interfaces with MCH to develop plans for provider staffing. (Pl.'s Resp. Def.'s S.M.F. ¶ 13.)

4

Before Bluewater employees can practice at MCH, MCH must grant them hospital privileges. (Pl.'s Resp. Def.'s S.M.F. ¶ 12.) After being granted privileges, Bluewater providers are also required to join MCH's medical staff and are obligated to adhere to MCH's by-laws. (Pl.'s Resp. Def.'s S.M.F. ¶ 12.) Bluewater employees also receive training from MCH in the hospital's policies and procedures and are obligated to assist in other hospital situations per MCH Medical Staff Protocols. (Pl.'s Resp. Def.'s S.M.F. ¶ 12.) In the event a Bluewater provider does not provide care commensurate with certain quality indicators, MCH speaks with that provider and on occasion develops a remedial plan of action for them. (Pl.'s A.S.M.F. ¶ 50.)

On October 29th, 2021, after filing two agreed-upon motions to extend the deadline for filing dispositive motions, MCH filed for summary judgment, seeking to obtain judgment on count II of Arsenault's complaint on the theory that they are not vicariously liable for the negligent conduct of Markowitz. On November 23rd, 2021, the Plaintiff filed their opposition and on November 13th, 2021, MCH filed their reply. MCH's Motion for Summary Judgment, now fully briefed, awaits this court's decision.

## STANDARD OF REVIEW

Summary judgment is warranted when a review of the parties' statements of material fact and the record evidence to which they refer, considered in the light most favorable to the nonmoving party, establish that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Ogden v. Labonville*, 2020 ME 133, ¶ 10, 242 A.3d 177. A material fact has the potential to influence the outcome of the case; and a genuine issue of material fact exists if the factfinder must decide between competing versions of the truth. *Lewis v. Concord General Mut. Ins. Co.*, 2014 ME 34, ¶ 10, 87 A.3d 732. If a properly supported motion has been filed, the nonmoving party must demonstrate

5

supporting record facts, disputed or undisputed, that establish a prima facie case for the claim(s) in issue. *Watt v. Unifirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897. In that regard, the court considers the record facts in the light most favorable to the non-moving party and gives him the benefit of all favorable inferences that may be drawn from those facts. *Levis v. Konitzky*, 2016 ME 167, ¶ 20, 151 A.3d 20.

## DISCUSSION

In support of its Motion for Summary Judgment, MCH offers three primary arguments. First, MCH claims that Markowitz was not an employee of MCH but was an independent contractor. Next, MCH claims that Markowitz was not acting as an agent of MCH when he allegedly delivered negligent care to Mr. Arsenault. Finally, MCH asserts that Markowitz was not acting with apparent authority when he treated Mr. Arsenault on September 13th, 2015.

### I. Employment

In Count II of the Plaintiff's complaint, she alleges that Markowitz was "an employee . . . of MCH and was acting within the course and scope of his employment . . . with MCH and that MCH is therefore vicariously liable for the negligence of Dr. Markowitz." MCH has moved for summary judgment alleging that there is no genuine dispute of material fact as to Markowitz's status as an independent contractor. In support, the Defendant principally relies on the Agreement which identifies Bluewater's providers as "independent contractors" and states that "no [Bluewater] physician is an employee of the hospital."

An employee's status is a mixed question of law and fact. *Penn v. FMC Corp.*, 2006 ME 87, ¶ 6, 901 A.2d 814. The seminal case for determining whether an individual is an employee or an independent contractor is *Murray's Case*, 130 Me. 181, 186, 154 A. 352, 354 (1931). There, the Law Court set forth eight factors to be applied in answering the question.[3] *Id.* Of the eight,

6

the Court has consistently held that control is the most important. *See Timberlake v. Frigon & Frigon*, 438 A.2d 1294, 1296 (Me. 1982).

Cases in which these factors have been utilized to resolve the question of an individual's status often arise in the workers compensation arena, *see, e.g., Murray's Case*, 130 Me. at 186, 154 A. at 354 (1931); *West v. C.A.M. Logging*, 670 A.2d 934 (Me. 1996), or in other negligence contexts distinguishable from the case here. *See, e.g., Legassie v. Bangor Publ. Co.*, 1999 ME 180, 741 A.2d 442; *Rainey v. Langen*, 2010 ME 56, 998 A.2d 342; *Day's Auto Body, Inc. v. Town of Medway*, 2016 ME 121, 145 A.3d 1030. Regardless of context, control remains the most important and determinative factor. *Poulette v. Herbert C. Haynes, Inc.*, 347 A.2d 596, 599 (Me. 1975).

As applied to the facts of this case, court reviews the eight factors as follows:

**1.** Two sophisticated parties have entered into a detailed contract. As part of the contract, MCH supplies equipment and staff to assist Bluewater's providers. MCH also supplies the building where the object of the Agreement occurs, has quality control expectations, and has regulations with respect to the use of the building. In return, Bluewater supplies both physician and non-physician providers who make independent medical decisions as they practice medicine.

**2.** A physician is a professional calling with a high degree of independent responsibility for the work.

---

[3] Those eight factors are: (1) the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price; (2) independent nature of the business or his distinct calling; (3) his employment of assistants with the right to supervise their activities; (4) his obligation to furnish necessary tools, supplies, and materials; (5) his right to control the progress of the work except as to final results; (6) the time for which the workman is employed (7) the method of payment, whether by time or by job; (8) whether the work is part of the regular business of the employer. *Murray's Case*, 130 Me. 181, 186, 154 A. 352, 354 (1931).

**3 & 4.** MCH supplies the staff and the equipment. There is a contractual provision allocating that responsibility between two sophisticated parties. It is not part of what Bluewater was contracted to do.

**5.** The Plaintiff has provided no evidence that MCH had the right to control the decisions that the Bluewater physicians were contracted to make. Their obligation is to apply their expertise. MCH credentialed the physicians, but that is not control of their work. Additionally, any provision allowing MCH to assess a physician's competency or conduct is control of the results of the work, not the means of the work.

**6 & 7.** Neither the time for which the Bluewater physicians were employed or the method of payment provide evidence in favor of an employee status.

**8.** The Plaintiff has failed to generate a genuine issue of material fact with respect to this factor. It is the regular business of a hospital to run an emergency room. The record is devoid of evidence that hospitals either typically employ their emergency room physicians or engage them as independent contractors.

The relationship between Bluewater and MCH is similar to that of a general contractor and an HVAC subcontractor on a sophisticated construction project. In such a case, the contract likely contains detailed plans and specifications outlining the details of the project, requirements regarding the credentials of the tradesmen, detailed worksite rules and regulations, supply of certain equipment or materials, testing of the work and quality control. None of that renders the subcontractor's employees the employees of the general contractor.

Finally, with regard to the relevant decision made by Markowitz here — the decision to discharge Mr. Arsenault from MCH without ordering the recommended MRI — the record does not suggest that any of MCH's bylaws or policies had an impact. Therefore, the court finds that

8

Markowitz was an independent contractor while practicing medicine at MCH. Accordingly, summary judgment is granted in favor of MCH on this issue.

## II. Agency

Whether an agency relationship exists is generally a question of fact. *Fitzgerald v. Hutchins*, 2009 ME 115, ¶ 12, 983 A.2d 382; *see also Ricci v. Barr*, No. CV-09-311, 2012 Me. Super. LEXIS 152 at *11 (July 17, 2012) ("The Law Court has repeatedly stated that the existence of an agency relationship and the existence and extent of apparent authority are questions of fact for the factfinder").

Generally, an employer may be found liable for the actions or omissions of an employee, but not an independent contractor. *Legassie*, 1999 ME 180, ¶ 5, 741 A.2d 442. However, an entity may also be held liable for the actions of an independent contractor when there is an established agency relationship between the two. *Bonk v. McPherson*, 605 A.2d 74, 78 (Me. 1992). An agency relationship is a fiduciary relationship "which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Desfosses v. Notis*, 333 A.2d 83, 86 (Me. 1975). The relationship of agency — and the corresponding authority of the agent to act on behalf of the principal may be either "actual" or "apparent" in its derivation. *Libby v. Concord General Mut. Ins. Co.*, 452 A.2d 979, 981 (Me. 1982).

### A. Actual Authority

First, the court addresses the Defendant's argument that Markowitz was not an agent of MCH when he treated Mr. Arsenault.

The Law Court has endorsed a three part test for determining whether a relationship of agency exists. *See State Farm Mut. Auto Ins. Co. v. Koshy*, 2010 ME 44, ¶ 16, 996 A.2d 651

9

(citing *Dent v. Exeter Hosp., Inc.*, 931 A.2d 1203, 1209 (N.H. 2007)). The elements of an agency relationship are "(1) authorization from the principal that the agent shall act for him or her; (2) the agent's consent to so act; and (3) the understanding that the principal is to exert some control over the agent's actions. *State Farm Mut. Auto. Ins. Co.*, 2010 ME 44, ¶ 16, 995 A.2d 651.

Here, in order for Arsenault to survive summary judgment, she must establish a prima facie case that (1) Markowitz was authorized to act by MCH; (2) Markowitz consented to so act; and (3) there existed an understanding that MCH was to exert some control over Markowitz's actions. *See Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 13, 48 A.3d 774.

The summary judgment record contains no evidence that Markowitz was authorized to act by MCH, nor as just mentioned, does the record support any understanding that MCH was to exert control over Markowitz's clinical judgments — the actions relevant in this analysis. To the contrary, the record establishes that Markowitz understood the nature of his presence at MCH was as an employee of Bluewater without express authority to act on MCH's behalf.

Accordingly, even viewing the evidence in a light most favorable to the plaintiff, and drawing all reasonable inferences in her favor, the court finds no genuine issue of material fact whether Markowitz was an agent acting with actual authority on September 13th, 2015. Accordingly, summary judgment is granted in favor of MCH on this issue.

## B. Apparent Authority

Next, the court addresses MCH's claims that Markowitz was not acting with apparent authority on behalf of MCH on September 13th, 2015. Apparent agency and apparent authority relate to situations in which an agency relationship is ostensibly created and an agent's actions are apparently supported by the principal. *Remmes v. Mark Travel Corp.*, 2015 ME 63, ¶ 22, 116 A.3d 466. Apparent authority exists only when the conduct of the principal leads a third party to

10

believe that a given party is the principal's agent. *Williams v. Inverness Corp.*, 664 A.2d 1244, 1246-47 (Me. 1995).

The Law Court has long endorsed a four element test for evaluating a claim of apparent authority: (1) The defendant either intentionally or negligently held a person out as its agent for services; (2) The plaintiff did in fact believe the person to be an agent of the defendant; (3) The plaintiff relied on the defendant's manifestation of agency; and (4) The plaintiff's reliance was justifiable. *Remmes,* 2015 ME 63, ¶ 22, 116 A.3d 466 (citing Restatement (Second) of Agency § 267 (1958)).

Here, the court finds that there is a genuine issue of material fact as to whether the hospital intentionally or negligently held Markowitz out as its agent for services. With the exception, perhaps, of the consent form, visitors to the emergency room would have no reason to believe anything other than that Markowitz was an agent of the hospital. They would have no preexisting relationship with him — meeting him for the first time when arriving at the MCH emergency room. Additionally, Markowitz's dress and badge did not distinguish him from a hospital employee.

The court cannot say the consent forms which Mr. Arsenault signed both at the emergency room after his accident and the next day at his physical therapy appointment means that the hospital did not hold him out as an agent as a matter of law. The language of the consent form itself does not clearly identify Markowitz as an independent contractor but instead says that "many of the physicians on staff at Mid Coast Health Services, including some attending physicians, are not employees or agents of the hospital, but rather, are independent contractors who have been granted the privilege of using the facilities for the care and treatment of their patients." The form does not specifically either identify Markowitz as one of these independent

11

contractors or specify that the emergency room physicians are independent contractors. *Cf. Dent v. Exeter Hospital, Inc.,* 931 A.2d 1203, 1210 (N.H. 2007) (consent form specifically stating that practitioners were independent contractors); *Sneed v. Univ. of Louisville Hospital,* 600 S.W.2d 221, 230-31(Ky. 2020) ("physicians are not hospital employees"). Given the ambiguity of MCH's consent form, the court finds that the Plaintiff has generated a jury question with respect to the first part of the test.

As applied to the circumstances of this case, the law on the remaining elements of apparent agency is unsettled in Maine. There is no Law Court decision on whether a plaintiff has to provide their own testimony regarding both their "in fact" belief of apparent agency and their justifiable reliance on its existence or whether those elements can be inferred from other evidence. There are also no Law Court decisions on whether a different standard should apply when an unconscious or incapacitated patient arrives at an emergency room, or when a patient later dies as a result of treatment and is unable to provide testimony.

Other states faced with this same outcome have adopted less stringent tests for determining apparent authority focused less on a decedent's in-fact belief or reliance, and more on what the decedent's reasonable belief would have been given the circumstances known at the time of the negligent treatment. *See Jennison v. Providence St. Vincent Med. Ctr.,* 25 P.3d 358, 366-67 (Or. 2001); *Sneed,* 600 S.W.3d 221, 233 (Ky. 2020) (Where a patient was incapable of "obtain[ing] actual knowledge" of whether a physician was acting under colorable authority granted by a principal, the question of apparent authority is answered by the "actions of the hospital, rather than the knowledge of the patient.")

In *Jennison,* the administratrix of a deceased Patient's estate brought suit against the hospital where the decedent was treated in the hours preceding her death. *Jennison,* 25 P.3d 358,

12

360 (Or. 2001). The alleged malpractice — the negligent insertion of a central venous catheter (central line) — occurred at the hands of an independent anesthesiologist while the patient was incapacitated during surgery. *Id.* Refusing to strictly apply the second Restatement's definition of apparent agency because it was impossible to determine if the decedent "actually . . . relied on the hospital's holding out or representation.", the court developed a two part test for apparent agency: (1) whether the hospital held itself out as a provider of medical services, and (2) whether, absent actual knowledge as to the provider's employment status, it was objectively reasonable for the patient to believe that the physician was an employee of the hospital. *Id.* at 367. Applying this test, the court determined it was "reasonable to assume" that the decedent "would believe that it would be a hospital employee" who negligently treated her — thus allowing a claim of vicarious negligence premised on apparent authority to survive summary judgment. *Id.*; *see also Calderone v. Kent County Memorial Hospital*, 360 F.Supp.2d 397, 402 (D. RI. 2005) (stating that requiring direct evidence of reliance of deceased patient is not necessary); *Estate of Cordero v. Christ Hosp.*, 958 A.2d 101, 107 (N.J. 2008) (applying an objective standard with deceased patient).

These courts with more objective apparent authority standards often rely on a requirement of reasonable belief as articulated in Restatement (Third) of Agency § 2.03 or Restatement (Second) of Torts § 429 as opposed to the actual justifiable reliance standard found in Restatement (Second) of Agency § 267. *See, e.g., Jennison*, 25 P.3d 358, 364-365 (applying § 429 instead of § 267 "in the hospital context"); *Estate of Cordero*, 958 A.2d at 106 (relying on sections 429 and 2.03). The fundamental reason for the different standard is that there is no logical reason to treat unconscious or deceased plaintiffs differently from those who could testify regarding reliance. *See Jennison*, 25 P.3d at 367 ("It would be incongruous to allow a patient

13

who survives a negligent encounter relatively intact to recover because she or he is able to testify whether she or he actually relied, but not to allow a severely impaired or deceased patient to recover because she or he is unable to recount what her or his actual belief was.").

The court concludes that the rule cited in these cases is the correct rule to apply. The court agrees, after giving the plaintiff the full benefit of all favorable inferences that may be drawn from the facts presented, that in these circumstances, when Dr. Markowitz appears clothed with the authority of the hospital, there is a genuine issue of material fact whether MCH's conduct conveyed to a patient in Mr. Arsenault's position a reasonable belief that the doctor acted on behalf of the hospital. There is no need to decide whether an unambiguous consent form would render the belief unreasonable as a matter of law. The consent form here leaves a question of fact to be determined by the jury

Because genuine issues of fact exist regarding whether Markowitz was an apparent agent of MCH at the time he treated Mr. Arsenault, summary judgment is denied on this issue.

## III. Conclusion

For the reasons set forth above, Defendant MCH's Motion for Summary Judgment is granted in part and denied in part. Summary judgment is granted in favor of MCH with respect to Markowitz's status as an independent contractor and actual agency. Summary judgment is denied as to the issue of apparent authority.

**Entry is:**

Defendant Mid Coast Hospital's Motion for Summary Judgment is Granted in Part and Denied in Part.

The Clerk is directed to incorporate this Order into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

14

Dated: 02/22/2022

_____
Thomas R. McKeon
Justice, Maine Superior Court

15

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-20-47

KRISTIN ARSENAULT

v.                                                          ORDER

BLUE WATER EMERGENCY PARTNERS
*et. al.*

The parties requested a conference pursuant to M.R.Civ.P. 26(g) regarding two issues arising from the settlement between the Plaintiff and Defendant Martin's Point Help Care, Inc. ("Martin's Point"). Namely, the two remaining Defendants both seek production of the settlement agreement between Plaintiff and Martin's Point and seek to call Dr. Wei Wei Lee, a primary care provider who the Plaintiff designated to testify against Martin's Point, as a witness at trial. As described below, the court agrees with the Defendants on both issues and orders Plaintiff to produce the settlement agreement pursuant to a confidentiality order and allows Defendants to introduce Dr. Lee's testimony at trial.

## FACTS

The facts are laid out in detail in the court's order on the Motion for Partial Summary Judgment filed by Defendant Blue Waters Emergency Partners ("Blue Waters"). In brief and somewhat simplified, on September 13, 2016, Wendell Arsenault went to the emergency room operated by Defendant Blue Waters after an accident. A CT Scan revealed an abnormality in Arsenault's brain. The radiologist informed the Blue Waters emergency physician that an MRI was needed quickly given the risk of a brain abscess. The Blue Waters physician did not order an MRI scan, but told Arsenault to report to his primary care provider at Martin's Point the next day.

1

The Martin's Point physician did not order the MRI until September 26. On September 17 or 18, the brain abscess began cause focal neurologic deficits resulting in diagnosis of the brain abscess and surgery on September 20. The Plaintiff alleges that the delay significantly reduced Arsenault's chances of recovery and caused his subsequent disability and death. The Plaintiff alleges that both the Blue Waters ER physician and the Martin's Point primary care physician are at fault for failing to secure an earlier MRI.

After mediation on November 19, 2020, the Plaintiff and Martin's Point reached a settlement agreement. Both of these discovery issues arose as a result of the settlement agreement.

**A. Settlement Agreement.**

The Defendants would like to know the terms of the settlement agreement in order to anticipate the effect of the settlement at trial after the application of 14 M.R.S.A. §§ 156 and 163.[1] The court agrees with the opinions of Magistrate Rich in *Barclay v. Gressit*, 2013 U.S. Dist. LEXIS 103518 (D. Me. July 24, 2013) and Justice Horton in *Laudermilk v. Wellpath, LLC*, 2019 Me. Super. LEXIS 135, *3. It clearly serves the purpose of the statutes governing settlements of fewer than all the parties to allow the remaining parties to know the terms of the settlement to the extent they affect the rights and liabilities of the remaining parties. The Plaintiff provided no good reason why that information should not be disclosed.

The court does agree to protect the settling parties' interests in confidentiality and agrees that the settlement agreement should be produced in accordance with a Confidentiality Order. Subject to a showing by the Defendants that production of copies of the documents themselves is necessary, the court orders production of the agreement pursuant to a Confidentiality Order under the same method of production that Justice Horton ordered in *Laudermilk*.

---

[1] Whether the existence of the settlement is in any way admissible at trial is an issue for trial.

2

**B. Dr. Lee's trial testimony.**

Plaintiff retained and designated Dr. Lee, a primary care provider, to testify regarding the fault of the Martin's Point physician. Not surprisingly, the remaining Defendants believe that testimony will be helpful to them. Dr. Lee was designated by the Plaintiff, but was not designated any of the Defendants. She was deposed and participated in the prelitigation screening panel. When the case went into suit, she was designated by the Plaintiff, but she was not included in any of the Defendants' initial expert designations served before the September, 2020 deadline. Defendant Mid Coast did reserve the right to call expert witnesses designated by the Plaintiff and by codefendants. The parties attended mediation on November 19, where Martin Point and the Plaintiff settled. On November 20, Blue Water supplemented its expert designation to include Dr. Lee.

Plaintiff applies the standard excusable neglect analysis that the court would apply to an untimely expert designation. *Hutz v. Alden*, 2011 ME 27, ¶¶ 19-22, 12 A.3d 1174. When an opposing party is not unfairly surprised, however, a court may allow expert witness testimony even without a finding of excusable neglect. *Estate of O'Brien-Hamel*, 2014 ME 75, ¶23; *Bray v. Grindle,* 2002 ME 130, ¶9.

Because the Plaintiff retained Dr. Lee, this is not the typical case. Here, the Plaintiff prepared and tendered Dr. Lee for a deposition and was thoroughly aware of Dr. Lee's testimony. Dr. Lee's testimony is part of the record in the case. As the Seventh Circuit held in similar circumstances, the party who retained the witness cannot claim surprise. *SEC v. Koenig*, 557 F.3d 736, 744 (7th Cir. 2009). Once testimony is part of the case, anyone can use it. One party cannot keep the testimony from the factfinder just because they retained the witness. "The cry of

3

'privilege' does not stop the Court and jury from hearing the opinion of the expert in the search for the truth." *Rancourt v. Waterville Urban Renewal Authority*, 223 A.2d 303, 305 (Me. 1966).

Here, Blue Water designated Dr. Lee immediately after the mediation, as soon as it was no longer apparent the Plaintiff would not use her testimony. Until then, Blue Water had good reason to believe Dr. Lee would be testifying at trial at the request of the Plaintiff. The November designation was only about two months after the September expert deadline. The Plaintiff cannot be said to have suffered any prejudice.[2]

The entry is:

Defendants' request for production of the settlement agreement is GRANTED. Plaintiff will produce the agreement subject to a confidentiality order. Although Plaintiff may produce a copy of the agreement to the Defense counsel subject to the confidentiality agreement, the court will not require the Plaintiff to do any more than show the agreement to the Defendants at this time.

Defendants' request to allow them to designate Dr. Lee as an expert witness is GRANTED. Defendant may either call Dr. Lee as a witness or introduce deposition testimony from Dr. Lee as permitted by the Maine Rules of Civil Procedure and the Maine Rules of Evidence.

This Order is incorporated on the docket by reference pursuant to M.R.Civ.P. 79(a).

DATE: 4/22/21

Thomas R. McKeon
Justice, Maine Superior Court

RECD CUMB CLERK
APR 28 '21 4:59

---

[2] Any objection to any aspect Dr. Lee's testimony based on Rule 403 would be addressed at or before trial.

4

KRISTEN A. ARSENAULT AS )
PERSONAL REPRESENTATIVE OF )
THE ESTATE OF WENDELL A. )
ARSENAULT, )
 )
 )    ORDER ON AND DEFENDANT'S
          Plaintiff, )    MOTION FOR PARTIAL SUMMARY
 )         JUDGMENT
          v. )
 )

MID COAST HOSPITAL, BLUE
WATER EMERGENCY PARTNERS,
LLC, and MARTIN'S POINT
HEALTH CARE, INC

          **Defendants**

Before this court is Defendant's, Blue Water Emergency Partners LLC., ("Blue Waters)'

Motion for Partial Summary Judgment. Although Blue Water vigorously disputes liability, the

Motion is limited to whether Defendants' negligence was the proximate of Wendell Arsenault's

death. It does not address either liability or other damages. For the reasons described below,

Defendant's Motion is denied.

## I. Factual Background

Wendell Arsenault was transported to Mid Coast Hospital on Sunday, September 13th,

2015, after he was involved in a vehicle accident. (PSAMF ¶ 1.) Mr. Arsenault did not remember

the accident but is alleged to have suffered acute mental status changes that caused him to drive

over a curb. (PSAMF ¶ 1). Dr. Charles Markowitz, an employee of the Defendant, evaluated Mr.

Arsenault in the emergency room. (PASMF ¶ 3.) Based on Mr. Arsenault's acute mental status

changes, Dr. Markowitz ordered a computed tomography scan ("CT scan") of Mr. Arsenault's

head. (PSAMF ¶ 3.) The CT scan showed an abnormality that could indicate either a metastatic

disease or brain abscess. (DSMF ¶ 3.) A radiologist flagged the abnormality and Dr. Markowitz

recommended that an MRI be completed. (DSMF ¶ 4.) However, Dr. Markowitz did not arrange for an MRI while Mr. Arsenault was at the hospital. (DSMF ¶ 5; PSAMF ¶ 8.) Instead, Dr. Markowitz discharged Mr. Arsenault and instructed him to follow up and arrange an MRI with his primary care physician ("PCP"). (DSMF ¶ 5; PSAMF ¶ 10.)

Mr. Arsenault contacted his primary care physician, Dr. David Inger, the following day, September 14th, 2015. (PSAMF ¶¶ 11-12.) Dr. Inger reviewed the CT scan on this date and understood the need to arrange an MRI. (DSMF ¶ 11; PSAMF ¶ 12.) However, the MRI was not ordered on an urgent basis but was instead scheduled for the following week. (DSMF ¶ 12; PSAMF ¶ 13.) Over the next few days, Mr. Arsenault attended physical therapy and showed no signs of cognitive complications. (PSAMF ¶ 14.) On September 17, he began to show signs of focal neurological deficits. **Citation.** September 18, 2015, Mr. Arsenault was again admitted to Mid Coast Hospital. (DSMF ¶ 12; PSAMF ¶¶ 15-16.) Mr. Arsenault underwent a new CT scan which showed that the mass had grown since it was first observed on the September 13th CT scan. (PSAMF ¶¶ 17-18.)

Mr. Arsenault was subsequently transported to Maine Medical Center where he underwent an MRI. (PSAMF ¶¶ 19-20.) The MRI showed that the mass observed on the September 13th CT scan was in fact an abscess stemming from a brain infection. (PSAMF ¶¶ 20-23.) Although Mr. Arsenault underwent various treatments, including surgery on September 20th and 30th, he continued to have fixed neurological deficits, including paralysis on his left side, problems related to speech, swallowing, and cognition, as well as seizures. (PSAMF ¶¶ 22-30.) Mr. Arsenault spent the remainder of his life in skilled care facilities until his death on February 10, 2016. (PSAMF ¶ 33.)

The Plaintiff has now brought this medical negligence case against various defendants. The Plaintiff alleges that Blue Water was negligent by virtue of its employee, Dr. Markowitz. Specifically, the Plaintiff alleges that Dr. Markowitz was negligent when he failed to take appropriate steps to arrange a timely MRI, which could have led to critical intervention in treating Mr. Arsenault's abscess. The Plaintiff further alleges that Dr. Markowitz's negligence led to Mr. Arsenault's development of fixed neurological defects, which in turn led to Mr. Arsenault's death.

The Plaintiff has presented evidence from two expert witnesses to support the argument that Dr. Markowitz's negligence was the cause of Mr. Arsenault's death: Dr. Jonathan Miller; and Dr. Shmuel Shoham. Dr. Miller is Plaintiff's neurosurgery expert and Dr. Shoham is Plaintiff's infectious disease expert.

Dr. Miller testified that 90-95% of patients with a brain abscess survive if the abscess is diagnosed and treated in a timely manner. (PSAMF ¶ 52.) However, a brain abscess becomes more serious the longer it is left untreated, thereby reducing the patient's chance of survival. (PSAMF ¶¶ 53-54.) In Mr. Arsenault's case, Dr. Miller testified that Mr. Arsenault would have more likely than not made a full recovery without permanent neurological deficits if he had been treated prior to September 17th. (PSAMF ¶ 61.) Although that chance of survival had decreased by the time Mr. Arsenault was admitted to the hospital on September 18th, Dr. Miller testified that in his opinion, Mr. Arsenault's chance of survival remained above fifty percent. (PSAMF ¶ 52.) Dr. Miller also stated that, in his opinion, Mr. Arsenault's chance of survival fell below 50% when Mr. Arsenault developed further neurological defects after his surgeries on September 20th and 30th. (PSAMF ¶¶ 64-65.) It is Dr. Miller's opinion that the fixed neurological defects were caused by the delay in diagnosing and treating Mr. Arsenault's brain abscess and that Mr. Arsenault's death was very likely the result of such neurological defects. (PSAMF ¶¶ 66-67.)

Dr. Shoham also testified that it is important to treat a brain abscess before a patient develops any neurological defects, and that a person is less likely to survive if treatment begins after the defects have begun. (PSAMF ¶ 68.) According to Dr. Shoham, the rate at which a brain abscess progresses is unpredictable, and "you don't know when you're hitting that cliff until you hit that cliff." (Shoham Dep. at 82:24-83:7.) Dr. Shoham also stated that, in his opinion, Mr. Arsenault's abscess could have been treated with antibiotics if it had been discovered by September 14th. (PSAMF ¶ 72.) Dr. Shoman testified that this antibiotic treatment could have either reduced the nature of Mr. Arsenault's surgeries, or avoided surgical intervention altogether. (PSAMF ¶ 72.) Dr. Shoham also stated that Mr. Arsenault would have more likely than not made a full recovery if his abscess had been diagnosed and treated by September 14th, but that he had suffered permanent and irreversible neurological damage by the time he was admitted to the hospital on September 18th. (PSAMF ¶¶ 73, 74, 75, 77.) Ultimately, Dr. Shoham concluded that Mr. Arsenault more likely than not died as a result of the neurological deficits he experienced as a result of the delay in timely diagnosing and treating his brain abscess.[1] (PSAMF ¶ 80.)

## II. Summary Judgment Standard

A party is entitled to summary judgment when review of the parties' statements of material facts and the record to which the statements refer, demonstrates that there is no genuine issue as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821; M.R. Civ. P. 56(c). A contested fact is "material" if it could potentially affect the outcome of the case. *Id.* A "genuine issue" of material

---

[1] Although the Defendant does not dispute that Dr. Miller and Dr. Shoham have so testified, the Defendant has qualified Dr. Miller's statements, arguing both that: the impact earlier treatment may have had on Mr. Arsenault's survival is unknowable; and Mr. Arsenault's abscess showed to be resistant to treatment on September 18th, indicating that earlier treatment would have not changed the outcome of Mr. Arsenault's condition. Both will be considered a disputed issue of fact for the purposes of this Motion.

fact exists if the claimed fact would require a factfinder to "choose between competing versions of the truth." *Id.* (quotations omitted). Once a properly supported motion is filed, the party opposing summary judgment must show that a factual dispute exists sufficient to establish a prima facie case for each element of the defense raised in order to avoid summary judgment. *Watt v. Unifirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897. A party who moves for summary judgment is entitled to judgment only if the party opposed to the motion, in response, fails to establish a prima facie case for each element of the defense raised. *Lougee Conservancy v. Citi Mortgage, Inc.*, 2012 ME 103, ¶ 12, 48 A.3d 774.

## III. Discussion

"To establish liability in a medical malpractice case, the plaintiff must show that the defendant's departure from a recognized standard of care was the proximate cause of the injury." *Phillips v. Eastern Maine Med. Ctr.*, 565 A.2d 306, 307 (Me. 1989). Here, the Defendant argues that it is entitled to judgment on Plaintiff's negligence claim as it relates to Mr. Arsenault's death because there is insufficient evidence to show that Dr. Markowitz's alleged negligence was the proximate cause of death.

### 1. Proximate Cause

Generally, proximate cause is a question of fact for the jury and is "that cause which, in a natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the result would not have occurred." *Webb v. Haas*, 1999 ME 74, ¶ 20, 728 A.2d 1261 (quotations omitted). "Evidence is sufficient to support a finding of proximate cause in the medical malpractice context if the evidence and inferences that may reasonably be drawn from it indicate that (1) the defendant's negligent conduct played a substantial part in causing the

injury, and (2) the injury was either a direct result or reasonably foreseeable consequence of that conduct." *Holmes v. E. Me. Med. Ctr.*, 2019 ME 84, ¶ 17, 208 A.3d 792.

While the Defendant has raised issues that may allow it to prevail on this issue at trial, the court finds, after accepting all inferences favorable to the Plaintiff, that the Plaintiff has presented competent expert testimony sufficient to avoid summary judgment. The court assumes, at it must when deciding summary judgment, that Dr. Markowitz should have done more to make certain Arsenault received an MRI on September 13 or 14.

Dr. Shoham testified that Arsenault would have made a full recovery had his abscess been diagnosed and treated by September 14. Both of the Plaintiff's experts testified that as a brain abscess lingers goes undiagnosed, the patient's chance of survival is reduced. As a result of the delay, by September 17 or 18, Arsenault was suffering from fixed, permanent and irreversible neurological defects. Both doctors testified that those defects were the cause of Arsenault's death in February.

These opinions are not an open ended view that earlier diagnosis reduces the chance of death. Instead, Plaintiff points to a specific event, the onset of focal neurological deficits, that would have been prevented, had Arsenault been promptly diagnosed and treated. The Plaintiff has presented sufficient testimony to avoid summary judgment that those neurological deficits were a substantial factor in Arsenault's death.

Defendant points out that Dr. Inger of Martin's Point assumed Arsenault's care on September 14. Although Dr. Inger is also alleged to have committed similar acts of negligence after Dr. Markowitz, the court is not going to weigh the degree of negligence of both the two physicians at the summary judgment stage. For the purposes of summary judgment and reading all inferences in favor of the Plaintiff, had Dr. Markowitz gotten Arsenault to an MRI, the proper

diagnosis and treatment would have occurred before Arsenault began to suffer from the neurological deficits which manifested themselves on September 17 and 18. Again, accepting Plaintiff's expert's testimony, there is an unbroken train of events to Arsenault's death. The neurological deficits were substantial a factor in his death.

The Defendants argues that Dr. Markowitz cannot be held to have caused Mr. Arsenault's death because his negligent acts did not reduce Mr. Arsenault's chance of survival below 50% by September 18, by which time others assumed care of Mr. Arsenault. The Defendant argues that this case presents a related "but distinctly different issue which . . . no Maine court has ever addressed: can a physician be said to have 'caused' a patient's death where it is alleged that his negligence increased the risk that the patient would die, but even after the negligence the patient's chance of survival was greater than 50%?" (Def's. Reply to Pl's. Opp. to Pl's. Mot. for Sum. Judg. pg 1).

If Arsenault was still alive and the expert testimony was that a failure to diagnose had reduced his chance of survival to something over 50%, then possibly, it would be mere speculation whether he was going to die in the future as a result of a misdiagnosis. *See Fabio v. Bellomo*, 489 N.W.2d 241 (Minn. 1992). Here, however, Arsenault has passed away. That does not require speculation. Just because there was a moment in time, in theory, when his chance of survival was over fifty percent, that does not mean there was no causation as a matter of law. The Defendant does not cite other authority that persuades the court on this argument.

Based on the forgoing, a reasonable fact finder could determine that Dr. Markowitz's alleged negligence was a substantial factor in causing Mr. Arsenault's fatal cognitive deficits and that those fatal deficits were a reasonably foreseeable result of that negligence. Accordingly, there is a disputed issue of material fact regarding whether Dr. Markowitz's alleged negligence was the

proximate cause of Mr. Arsenault's death and summary judgment is inappropriate on such grounds.

## V. Conclusion

The Plaintiff has presented a prima facie case showing that Dr. Markowitz's negligence was the proximate cause of Mr. Arsenault's death. The affect other contributing negligence or factors had on causing Mr. Arsenault's death should be submitted to the finder of fact.

The entry is:

Defendant's Motion for Summary Judgment is DENIED.

The Clerk is directed to incorporate this Order into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: _Apr. 12, 2021_

_____
Thomas McKeon
Justice, Superior Court